IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 


No. 02-0356

 
Kerr-Mcgee Corporation, 
Et Al.
 
v.
 
Jimmy Helton, Et 
Al.
 


On Petition for Review from 
the
Court of Appeals for the 
Seventh District of Texas

 
Argued on January 22, 2003


Justice Smith delivered the opinion of 
the Court, in which Chief Justice 
Phillips,

Justice Hecht, Justice Owen, Justice 
Jefferson, Justice Schneider, Justice Wainwright, and Justice Brister joined.
 
Justice Hecht filed a concurring 
opinion, in which Justice Wainwright 
joined.
Justice O=Neill did not participate in the 
decision.
 
Oil 
and gas lessors brought suit against lessee for breach 
of the implied covenant to protect the leasehold against drainage.  The case was tried to the bench.  At trial, lessors= 
sole evidence of the amount of damages was the expert testimony of Michael 
Riley.  After cross-examining Riley, 
lessee objected and moved to strike Riley=s 
testimony as unreliable.  The trial 
court denied the motion and, at the close of trial, rendered judgment for lessors.  
Concluding, among other things, that the evidence was legally sufficient 
to support the damages award, the court of appeals affirmed.  ___ S.W.3d 
___.  We conclude that 
Riley=s 
testimony regarding the amount of damages is unreliable and is therefore no 
evidence.  Accordingly, because 
lessors failed to present any competent evidence on an 
essential element of their cause of action, we reverse the court of appeals= 
judgment and render judgment that lessors take 
nothing.
I
Kerr-McGee 
Corporation acquired sixty-one oil and gas leases from the respondents, who 
consist of sixty-nine  
individuals, estates, and trusts (collectively referred to as 
AHelton@).  The leases cover all of Section 10, 
Block R.E., Roberts and Eddleman Survey, in Wheeler 
County.[1]  Kerr-McGee pooled the leases effective 
March 28, 1994.  Kerr-McGee also 
owned leases in several sections of the West Park Field surrounding section 
10.[2] 

In 
September 1993, Kerr-McGee began drilling a wildcat well in section 17, which is 
directly south of section 10.  This 
well, Holmes 17-1, was a deep gas well in the West Park Field, Upper Morrow 
formation of the Anadarko Basin.  It 
was completed on December 4, 1993.  
Holmes 17-1 was located 660 feet from the northern and western boundary 
lines of section 17.  It encountered 
approximately 73 feet of the previously unknown Lower Puryear zone in the Upper Morrow formation and was a very 
profitable well, producing approximately 8.7 Bcf 
(billion cubic feet) of gas over its lifetime.
After 
Holmes 17-1 was drilled, Kerr-McGee drilled several additional wells in the West 
Park Field, including two wells in section 10 (Mitchell 10-1 and Mitchell 
10-2).  Mitchell 10-1, which was 
located 1600 feet from the southern boundary line of section 10, was completed 
in August 1994, and encountered no Lower Puryear.  Kerr-McGee next drilled the Eden 11-1 
well in section 11, which is directly west of section 10.  Kerr-McGee placed this well 467 feet 
from the eastern and southern boundary lines of section 11, as close as spacing 
rules[3] 
would allow to the boundary lines, thereby placing the Eden 11-1 as close as 
possible to Holmes 17-1.  Eden 11-1 
encountered 7 feet of Lower Puryear.  It was completed in January 1995 in 
another zone, the Puryear, and will make a reasonable 
profit.  
After 
completing a seismic survey, Kerr-McGee drilled the Zybach 16-1 well in section 16, the section southwest of 
section 10.  Zybach 16-1 was spudded in 
February 1996 near the southern boundary line of section 16.  It encountered no Lower Puryear.  
KerrBMcGee 
then returned to section 10 to drill an additional well, Mitchell 10-2, in June 
1996.  Although Mitchell 10-2 was 
467 feet from the southern boundary line of section 10, it was 2300 feet from 
the western boundary line, and thus was not very close to Holmes 17-1.  Mitchell 10-2 encountered approximately 
7 feet of Lower Puryear, was completed in the Lower 
Puryear and two other zones, and was a marginal 
producer.  It will not make a 
profit.  
In 
December 1996, Kerr-McGee completed a second well in section 16.  This well, Fleetwood Trust 16-1, was 
located west of Holmes 17-1, 467 feet from the eastern boundary line of section 
16.  Fleetwood Trust 16-1, which was 
placed as close as possible to Holmes 17-1, encountered approximately 79 feet of 
Lower Puryear, produced approximately 7.0 Bcf of gas, and was also a very profitable well.  Kerr-McGee drilled three additional 
wells in the West Park Field, for a total of nine wells.[4]
The 
parties agree that, in the Upper Morrow formation in the Anadarko Basin, 
hydrocarbon-bearing rock and sands were deposited by streams and rivers and are 
therefore difficult to find.  The 
area is extremely difficult to map, and deposits are easily missed.  Of the nine wells Kerr-McGee drilled in 
the West Park Field, four wells C 
Holmes 17-1, Eden 11-1, Mitchell 10-2, and Fleetwood Trust 16-1 C 
encountered the same Lower Puryear reservoir.  Holmes 17-1 and Fleetwood Trust 16-1, 
which were located in the thick part of the reservoir, were both very profitable 
within that formation.
Although 
two wells were drilled in section 10, Helton brought suit claiming that 
Kerr-McGee breached its implied covenant to protect section 10 from drainage 
from the Holmes 17-1 well.  Helton 
alleged that an offset well should have been drilled in section 10, much nearer 
to Holmes 17-1 than the Mitchell 10-1 and 10-2 wells, and that a reasonably 
prudent operator would have had the offset well producing by February 1, 
1995.  According to Helton, the 
offset well should have been drilled 467 feet from the southern boundary line 
and 660 feet from the western boundary line of section 10, placing it 1127 feet 
directly north of Holmes 17-1.  
Helton asserts that a reasonably prudent operator who owned only the 
leases in section 10 would have drilled a protection well as close as possible 
to a known producer such as Holmes 17-1, but that Kerr-McGee had no economic 
incentive to do so because it owned leases in the surrounding sections.  According to Helton, Kerr-McGee drilled 
the Mitchell 10-1 and 10-2 wells farther away from Holmes 17-1 in an attempt to 
find another Lower Puryear deposit rather than to 
protect section 10 from drainage by Holmes 17-1.
Helton 
argued that, if drilled as close as possible to Holmes 17-1, the hypothetical 
offset well would have encountered the same Lower Puryear reservoir as Holmes 17-1 and would have been very 
profitable.  Dr. Dennis Kerr, 
Helton=s 
petroleum geology expert, testified that the Lower Puryear reservoir from which Holmes 17-1 and Fleetwood Trust 
16-1 were draining extended north to the location of the hypothetical offset 
well, and that there would be approximately 60 feet of Lower Puryear reservoir at that location.  Kerr-McGee does not dispute this 
evidence on appeal.
To 
establish liability and damages, Helton offered the expert testimony of Michael 
Riley, a petroleum engineer.  
Riley=s 
testimony was presented to establish the amount of gas the hypothetical offset 
well would have produced, that a reasonably prudent operator would have drilled 
the well, and the amount of royalties Helton would have received.  It is undisputed that Helton=s 
Aclaims 
for damages have been and are based solely on the royalties that the 
hypothetical protection well would have yielded [Helton] had it been timely 
drilled.@  Although Kerr-McGee challenged the 
measure of damages in the trial court, arguing that damages should be measured 
by the amount of gas drained rather than what the hypothetical well would have 
produced, Kerr-McGee does not challenge Helton=s 
measure of damages on appeal.  Riley 
testified that the hypothetical offset well would have produced approximately 
6.1 Bcf of gas, and that Helton, who owned a 3/16 
royalty interest, would have received $2,149,299.60.
During 
cross-examination, Riley testified that he based his projection of the 
hypothetical well=s 
production on the assumption that the hypothetical well would have produced at 
the same rate as the Holmes 17-1 well until the Fleetwood Trust 16-1 well began 
producing, and then the three wells would have produced at the same rate until 
the reservoir was depleted.  When 
asked if the production from these wells would tell him what the hypothetical 
well would have produced, he answered: ANo, 
it does not.@  Further, Riley was asked, A[Y]ou simply do not have any factual basis for projecting the 
production of that hypothetical well, do you?@  He responded, AThat is correct.@  Immediately after Riley was 
cross-examined and dismissed, Kerr-McGee objected to Riley=s 
testimony as unreliable and moved to strike.  The trial court denied the motion.  Riley was recalled twice, once during 
Helton=s 
case-in-chief and once in rebuttal.
Kerr-McGee 
presented four expert witnesses regarding liability.  Ronald Platt, a petroleum engineer, 
opined that Holmes 17-1 had not drained a substantial amount of gas from 
underneath section 10.  He further 
opined that the hypothetical offset well would not have produced sufficient gas 
to recover the costs of drilling and completion (approximately $1.5 million) 
and, therefore, a reasonably prudent operator would not have drilled the 
well.  In support of those opinions, 
Platt testified that: (1) the original gas in place in the entire Lower Puryear reservoir was 17.8 Bcf; 
(2) the original gas in place in the Lower Puryear 
reservoir below section 10 was .4 Bcf; and (3) the 
value of the recoverable gas in the Lower Puryear 
reservoir below section 10 was $640,000.  
Kerr-McGee=s 
other experts also testified that a reasonably prudent operator would not have 
drilled the hypothetical well.
At 
the close of Helton=s 
case-in-chief, Kerr-McGee filed a motion for judgment as a matter of law.  Kerr-McGee argued, among other things, 
that: APlaintiffs 
have wholly failed to sustain their burden of proof as to the amount of their 
damages, if any.  There is no 
competent evidence from which the amount of damages, if any, can be 
computed.@  After the close of all the evidence and 
before the trial court announced a decision, Kerr-McGee filed a motion for 
judgment, again asserting that there was no competent evidence to support a 
finding of damages.  The trial court 
denied both motions.
The 
trial court issued findings of fact and conclusions of law.  In its findings of fact, the trial court 
found that A[Kerr-McGee] 
breached the implied covenant under the Section 10 oil and gas leases to protect 
that portion of the Lower Puryear interval of the 
Upper Morrow formation in and under Section 10 from substantial drainage.@  It further found that: (1) A[t]he 
Holmes 17-1 well drained substantial volumes of gas from underneath Section 10 
during 1994@; 
(2) A[a] 
reasonably prudent operator owning the oil and gas leases covering Section 10 
would have commenced drilling a protection well 660 feet from the West line and 
467 feet from the South line of Section 10 in sufficient time to have such well 
producing gas by February 1, 1995@; 
and (3) A[t]he 
hypothetical protection well would have paid out in a reasonable time and would 
have made a reasonable profit for the lessee after deducting the costs of 
drilling, completing, operating and marketing.@  The trial court awarded $863,649.36 as 
lost royalties ($840,910.51 in royalties from February 1, 1995 to March 16, 2001 
and $22,738.85 for future damages after March 16, 2001).[5]
After 
the trial court rendered judgment for Helton, Kerr-McGee filed a motion to 
modify the judgment or for new trial, arguing, among other things, that there 
was no competent evidence to support the trial court=s 
findings on the amount of damages.  
Kerr-McGee also filed a request for additional findings of fact on the 
volume of gas drained, the dollar value of that gas, and the monthly volume and 
value of the gas upon which the trial court calculated damages.  The trial court denied Kerr-McGee=s 
motion to modify the judgment or for new trial and did not issue additional 
findings.  Kerr-McGee filed a timely 
notice of appeal.
The 
court of appeals affirmed. ___ S.W.3d ___.  Citing Southeastern Pipe Line Co. v. 
Tichacek, 977 S.W.2d 393 (Tex.App.BCorpus 
Christi 1998), rev=d 
on other grounds, 997 S.W.2d 166 (Tex. 1999), the court of appeals 
concluded: AThus, 
while Riley=s 
opinion may not be absolute, we believe there is some factual basis to support 
his opinion as to the amount of damages.  
The determination as to the credibility of that opinion is to be made by 
the trier of fact.@  ___ S.W.3d at 
___.  The court of appeals 
did not analyze or otherwise address whether Riley=s 
testimony was reliable under this Court=s 
established jurisprudence regarding expert testimony.
Kerr-McGee 
filed a petition for review asserting that Riley=s 
testimony is Aunreliable, 
incompetent and inadmissable@ 
and there is no evidence Ato 
support an award of damages or to support the amount of damages awarded.@  Kerr-McGee asserts that the petition 
Apresents 
one overarching issue, i.e., whether there is any reliable evidence to prove the 
volume of gas the proposed protection well would have produced and thus, whether 
there is any evidence to support an award of damages, including the amount found 
by the trial court.@
Kerr-McGee 
states that it assumes, Afor 
purposes of argument, that the basic liability findings, other than the amount 
of damages, were supported by legally sufficient evidence.@  Kerr-McGee states, however, that 
although these facts are assumed for purposes of argument, they were vigorously 
contested and denied in the trial court.  
Because Kerr-McGee assumes, for purposes of appeal, that the basic 
liability findings other than the amount of damages are supported by some 
evidence, we shall do the same.
II
Before 
reaching the merits, we consider several preservation-of-error issues raised by 
Helton.  Specifically, Helton 
complains that Kerr-McGee=s 
objection was untimely, that Kerr-McGee waived its complaint by failing to 
object to certain exhibits, and that Kerr-McGee=s 
objection was not sufficiently specific to preserve a challenge to Riley=s 
methodology.  To preserve error for 
appeal, a party must make a timely, specific objection or motion to the trial 
court that states the grounds for the ruling sought with sufficient specificity 
and complies with the rules of evidence or procedure.  Tex. R. App. P. 33.1.  
A
Helton 
first complains that Kerr-McGee=s 
motion to strike Riley=s 
testimony was untimely.  Helton 
contends that, to preserve its no-evidence challenge to Riley=s 
testimony based on reliability, Kerr-McGee was required to object to the 
testimony before it was admitted, either before trial or after taking the 
witness on voir dire.  Thus, Helton concludes, by waiting until 
after cross-examination to object, Kerr-McGee failed to preserve its appellate 
complaint that the testimony was unreliable, and thus no evidence.  
In 
Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998), we 
held that A[t]o 
preserve a complaint that scientific evidence is unreliable and thus, no 
evidence, a party must object to the evidence before trial or when the evidence 
is offered.@  We did not consider whether a motion to 
strike after cross-examination would be sufficient to preserve error; we held 
only that an objection made after the jury verdict comes too late.  In Guadalupe-Blanco River Authority 
v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002), we revisited the preservation 
issue and concluded that an objection made when the witness began his testimony 
was timely.  Thus, Kerr-McGee was 
not required to object before trial.
Relying 
on Texas Rule of Evidence 705(b), Helton contends that Kerr-McGee should have 
conducted a voir dire examination and objected before 
Riley=s 
testimony was admitted.  Rule 705(b) 
provides: APrior 
to the expert giving the expert=s 
opinion or disclosing the underlying facts or data, a party against whom the 
opinion is offered upon request . . . in a civil case may . . . be permitted to 
conduct a voir dire examination directed 
to the underlying facts or data upon which the opinion is based.  This examination shall be conducted out 
of the hearing of the jury.@  Tex. R. Evid. 705(b).  
Kerr-McGee, however, relies on Rule 705(a) to establish that its motion 
to strike following cross-examination was timely.  Rule 705(a) provides that A[t]he 
expert may in any event disclose on direct examination, or be required to 
disclose on cross-examination, the underlying facts or data.@  Tex. R. Evid. 705(a).  
According to Kerr-McGee, because Rule 705(a) contemplates that the party 
against whom the evidence is offered may elicit testimony regarding the 
underlying facts or data on cross-examination, a motion to strike the testimony 
after such cross-examination is timely.  

As 
we explained in Maritime Overseas v. Ellis, requiring a reliability 
objection during trial prevents trial or appeal by ambush: AWithout 
requiring a timely objection to the reliability of the scientific evidence, the 
offering party is not given an opportunity to cure any defect that may exist, 
and will be subject to trial and appeal by ambush.@  Maritime 
Overseas, 971 S.W.2d at 409.  
To hold otherwise, we reasoned, is Asimply 
unfair@ 
because the offering party Arelied 
on the fact that the evidence was admitted.@  Id.  In this case, Helton was not subjected to 
Atrial 
or appeal by ambush.@  Kerr-McGee objected to the testimony 
immediately after cross-examination, when the basis for the objection became 
apparent, and Helton had the opportunity to respond to the objection when Riley 
was recalled.  Accordingly, we 
conclude that Kerr-McGee=s 
motion to strike after cross-examination was sufficient to preserve its 
no-evidence complaint on appeal.
B
Helton 
further suggests that Kerr-McGee failed to preserve its no-evidence complaint by 
allowing Helton to admit, without objection, two exhibits (16 and 21) 
demonstrating Riley=s 
estimates of the gas production of the hypothetical well.  We find no merit in this argument.  It is true that Kerr-McGee=s 
motion to strike did not encompass the exhibits; it was directed to Riley=s 
testimony.  But Kerr-McGee is not 
challenging the admissibility of those exhibits on appeal.  Rather, it is making a no-evidence 
challenge to Riley=s 
testimony.  We have concluded that 
Kerr-McGee preserved its no-evidence complaint by timely objecting to Riley=s 
testimony based on reliability.  If 
Riley=s 
opinion is found to be unreliable, and thus no evidence, exhibits 16 and 21, 
which are merely representations of Riley=s 
opinion, would be no evidence for the same reasons.
C
Last, 
Helton contends that, even if timely, Kerr-McGee=s 
objection in the trial court was more limited than Kerr-McGee=s 
argument on appeal.  Helton contends 
that A[a]n 
expert=s 
opinion may be unreliable in two different ways: (1) the factual foundation is 
unreliable or (2) improper methodology is used based on reliable facts.@  According to Helton, Kerr-McGee=s 
trial objection was solely that Riley=s 
testimony was based upon an unreliable factual foundation, and therefore 
Kerr-McGee cannot challenge Riley=s 
methodology on appeal.
In 
its cross-examination, Kerr-McGee probed the basis for Riley=s 
opinion on damages.  After Riley 
admitted that he had no factual basis for his projections, Kerr-McGee=s 
counsel objected:


[COUNSEL]: 
At this point, Your Honor, the Defendant would move to strike the testimony of 
Mr. Riley, with respect to damages, on the grounds that by his own admission, 
his estimate, his numbers, on damages are purely estimates and are not based 
upon any factual foundation.
 
And, 
of course, as this Court knows, for an expert=s 
opinion to be admissible and to constitute competent evidence, it must have a 
reliable factual foundation.  And by 
his own admission, he has stated that those are estimates of what might have 
been produced if the theories about the hypothetical well are correct.  And that does not constitute a factual 
foundation upon which an expert opinion can be based.  Therefore, we move to strike his 
testimony as to damages.

 


Also on the grounds of incompetence.  It is not within his scope of his 
[expertise] or based upon an adequate factual foundation.  

 


. 
. . .

 


. 
. . The question is whether Mr. Riley=s 
estimate of the production from the hypothetical well is based upon any 
foundation of fact.  And we submit 
that it is not.

 
It 
is clear that Kerr-McGee was objecting on the basis that Riley=s 
opinion was not sufficiently supported with facts or data, and that is the basis 
for Kerr-McGee=s 
no-evidence challenge in this Court.
III
An 
oil and gas lessee has an implied obligation to protect the leasehold from 
drainage.  Amoco Prod. Co. v. Alexander, 622 S.W.2d 563, 
567 (Tex. 1981).  
Local drainage occurs when oil migrates from under a lease to the well 
bore of a producing well on an adjacent lease.  Id.  Drainage may be prevented by drilling an 
offset well.  Id.  To establish a breach of the implied 
covenant to protect against drainage, a lessor must 
show proof (1) of substantial drainage from the lessor=s 
field, and (2) that a reasonably prudent operator would have acted to prevent 
the drainage.  Id. at 568.  
Once 
the lessor has established a breach of the implied 
covenant to protect against drainage, the lessor is 
entitled to damages.  One measure of 
damages is the amount of royalties that the lessor 
would have received from the offset well on its lease.  See Tex. Pac. Coal & Oil Co. v. 
Barker, 6 S.W.2d 1031, 1038 (Tex. 1928) (discussing other cases that Aannounce 
the correct doctrine which requires the lessee to pay the lessor the amount he actually loses by awarding him, without 
deduction, the full value of royalty lost to him through the lessee=s 
failure to exercise ordinary care to either develop the minerals in the leased 
premises or to protect same from drainage by nearby wells@).
Kerr-McGee 
does not challenge the trial court=s 
findings that there was substantial drainage, that a reasonably prudent operator 
would have drilled the hypothetical offset well, or that the well would have 
been profitable.  Kerr-McGee 
challenges only Helton=s 
evidence of the amount of damages, arguing that Riley=s 
testimony is unreliable, and therefore no evidence supports the damages awarded 
by the trial court.
A
When 
reviewing a no-evidence challenge, we Aview 
the evidence in a light that tends to support the finding of the disputed fact 
and disregard all evidence and inferences to the contrary.@  Bradford v. 
Vento, 48 S.W.3d 749, 754 (Tex. 2001).  In determining whether an expert=s 
testimony constitutes some evidence, however, Aan 
expert=s 
bare opinion will not suffice@ 
and A[t]he 
substance of the testimony must be considered.@  Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  Further, A[t]he 
underlying data should be independently evaluated in determining if the opinion 
itself is reliable.@  Id. at 713; 
Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 808 (Tex. 
2002).  The proponent of the 
evidence bears the burden of demonstrating that the expert=s 
opinion is reliable.  E.I. du Pont de Nemours & Co. v. 
Robinson, 923 S.W.2d 549, 557 (Tex. 1995).  If the expert=s 
testimony is not reliable, it is not evidence.  Havner, 
953 S.W.2d at 713.
The 
reliability requirement focuses on the principles, research, and methodology 
underlying an expert=s 
conclusions.  Exxon Pipeline Co. v. Zwahr, 88 
S.W.3d 623, 629 (Tex. 2002).  
Under this requirement, expert testimony is unreliable if it is not 
grounded A>in 
the methods and procedures of science= 
and is no more than >subjective 
belief or unsupported speculation.=@  Id. (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993)).  Expert testimony is also unreliable if 
the court concludes that A>there 
is simply too great an analytical gap between the data and the opinion 
proffered.=@  Gammill v. Jack Williams Chevrolet, Inc., 972 
S.W.2d 713, 726 (Tex. 1998) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 
136, 146 (1997)).  In reviewing the 
reliability of expert testimony, the court is not to determine whether the 
expert=s 
conclusions are correct; rather, the court should determine only whether the 
analysis used to reach those conclusions is reliable.  Zwahr, 
88 S.W.3d at 629 (citing Gammill, 972 S.W.2d at 
728).
B
Long 
before Robinson, Texas courts required that evidence of drainage be based 
upon more than mere speculation.  
Barker, 6 S.W.2d at 1034.  Although estimating the production of a 
hypothetical well necessarily involves circumstantial evidence, for the lessor to recover damages, A[t]he 
amount and value of oil or gas production, obtained or obtainable through 
reasonable diligence, must be definitely alleged, and must be proven with 
reasonable certainty before damages may be allowed.@  Id.  As in any case seeking recovery of lost 
profits, recovery does not require that the loss be susceptible of exact 
calculation.  Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992).  But, at a minimum, opinions or estimates 
of lost profits must be based on objective facts, figures, or data from which 
the amount of lost profits can be ascertained.  
Id.
Riley 
testified that he looked at numerous accepted sources, such as well logs, base 
maps, production information, Railroad Commission records, and scout cards, to 
obtain data about the area and the wells surrounding the hypothetical well=s 
location.  Riley testified that if 
the hypothetical offset well had been drilled and placed in production in 
February 1995, it and Holmes 17-1 would have produced at the same rate, 
approximately 8 Mcf of gas per day (the rate that 
Holmes 17-1 was producing at that time), and that the rate would have declined 
Aat 
a certain rate@ 
(depicted in exhibit 16) until February 1997, when production would have been 
approximately 4 Mcf per day.  At that point, Fleetwood Trust 16-1 
would have gone into full production, and the production rates of all three 
wells would have declined more steeply until the reservoir was depleted.
As 
noted, Kerr-McGee does not dispute on appeal Dr. Kerr=s 
testimony that the Lower Puryear reservoir encountered 
by Holmes 17-1, Eden 11-1, Mitchell 10-2, and Fleetwood Trust 16-1 extended 
below section 10, and that the hypothetical offset well would have had 
approximately 60 feet of Lower Puryear beneath 
it.  But Kerr-McGee argues: ACrediting 
the geological testimony of Dr. Kerr that the hypothetical well site would have 
60 feet of Lower Puryear, one might guess that the 
well would produce some gas, but the issue is not whether it would produce B 
the issue is how much it would produce.@ 
(Emphasis in original.)  Kerr-McGee complains that Riley=s 
assumption that the hypothetical well would have produced at the same rate as 
Holmes 17-1 and later Fleetwood Trust 16-1 is insupportable.  According to Kerr-McGee, Riley=s 
assumption is contrary to the actual facts because production records show that 
Holmes 17-1 and Fleetwood Trust 16-1 did not produce at the same rate.  Kerr-McGee also asserts that the 
hypothetical well, with 60 feet of Lower Puryear, 
would likely not produce the same as Holmes 17-1 and Fleetwood Trust 16-1, which 
had 73 feet and 79 feet of Lower Puryear, because, all 
other factors being equal, thickness determines a well=s 
productivity.  In sum, Kerr-McGee 
contends that it is not reasonable to assume that the wells would have produced 
at the same rate. 
Kerr-McGee 
cross-examined Riley on these issues as follows:


Q. 
As a Petroleum Engineer, Mr. Riley, assuming all factors are equal, except the 
thickness of the reservoir, would the wells produce at the same 
rate?

 


A. 
Not assuming all things are equal, no.  

 


Q. 
So, if everything is equal, except the thickness of the reservoir, the thick 
reservoir is going to produce at a higher rate.  The well in the thicker reservoir is 
going to produce at a higher rate, isn=t 
it?

 


A. 
Yes.  

 


. 
. . .

 


Q. 
All right.  Well, we know that 
Holmes and Fleetwood had different thicknesses of reservoirs, don't we? 


 


A. 
That is correct. 

 


Q. 
And we know from the production histories that they produced at a different rate 
‑‑ 

 


A. 
That is correct. 

 


Q. 
‑‑ don=t 
we?  So, how is it then, that you theorize that this hypothetical well with an 
unknown thickness of formation, would produce at the same rate as Holmes and 
Fleetwood?  

 


A. 
Because not all other things are equal.  


 


. 
. . .

 


Q. 
If it=s 
thinner, then it=s 
certainly not going to produce at the same rate, is it?  

 


A. 
I can=t 
say that for sure.  There are other 
factors in the reservoir.  Your 
water saturation affects your permeability.  Your skin damage from the invasion of 
drilling fluids into the well bore can drastically affect your flow capacity of 
the well.  

 


Q. 
And the porosity would certainly affect it, wouldn=t 
it?  

 


A. 
The porosity is somewhat linked to the permeability B

 


. 
. . . 

 


Q. 
A well with 18% porosity would not produce at a greater rate than one with 10% 
porosity?  

 


A. 
As I stated earlier, there seems to be a ‑‑ appear to be a relationship between 
permeability and porosity and it is not the porosity that causes the increase in 
production.  It=s 
the permeability.  


 


Q. 
Well, whatever that is, we don=t 
know any of that about this hypothetical well, do we?  

 


A. 
No.  

 


Q. 
So you don=t 
have any of those factors as real factors upon which to base your theory, that 
it would have produced at the same rate as Holmes and Fleetwood, do you?  

 


A. 
We have some indications.  


 


Q. 
But you don=t 
have any real data, do you?
 
A. 
Not on the hypothetical well.  


 


Q. 
All of it has to be based on assumptions, doesn=t 
it?  

 


A. 
Yes.  

 


Q. 
And none of those assumptions are supportable, that is, you cannot verify any of 
those assumptions, can you?  


 


A. 
Yes.  

 


Q. 
Which ones can you verify?  


 


A. 
I was able to verify the skin damage in the Holmes 17‑1.  

 


Q. 
But you don=t 
know whether there would be any skin damage in the hypothetical well, do 
you?  

 


A. 
No.  

 


Q. 
So you can=t 
verify that it would have the same skin damage problem that the Holmes well had, 
can you?  

 


A. 
No.  

 


Q. 
Was there any other factor that you think you can verify?  

 


A. 
No.  

 


Q. 
All right.  So, the net result is 
that, as to your opinion as to the productivity of the hypothetical well, is 
purely assumptions based upon no empirical data, isn=t 
it?  

 


A. 
No empirical data, yes.  


 


Q. 
Yes.  So it=s 
not founded upon any fact, provable fact, is it, Mr. Riley?  

 


A. 
Yes, I think there are some provable facts.  

 


Q. 
Well, which ones are they?  That=s 
what I=m 
trying to find out.  What is 
the provable fact upon which you can base that opinion? 
 
A. 
The fact that the Holmes has significant skin damage to it?

 


Q. 
But you just got through admitting that you don=t 
know whether the hypothetical well would have any skin damage, or not, do 
you?  Didn=t 
you admit that?  

 


A. 
Yes.  

 


. 
. . .  

 


Q. 
So we know nothing about what this hypothetical well would have in that respect do we?  


 


A. 
The answer ‑‑  

 


Q. 
Excuse me.  Do we, or do we 
not?  

 


A. 
No.  

 


. 
. . .

 


Q. 
Now then, I am searching for any provable fact, a fact as to which you have 
proof upon which you can base your opinion as to the productivity of the 
hypothetical well.  

 


A. 
I do not know the productivity of the hypothetical well.  

 


Q. 
But that=s 
what you based your entire damage calculations on in this case, is that that 
well would have produced 6.1 Bcf of gas had it been 
drilled and commenced production as of February 1, 1995, isn=t 
it?  

 


A. 
Yes, I did.  

 


Q. 
And you have absolutely no factual data upon which to support that opinion, do 
you Mr. Riley?  

 


A. 
There are ‑‑ the only fact I have to base that on is what the wells in the 
immediate area are producing.  


 


Q. 
Okay.  And that does not tell you 
what the hypothetical well would have produced, does it?  
 
A. 
No, it does not.  

 


Q. 
All right.  So back to my statement 
a moment ago, and to be completely honest, and I think you are, that you simply 
do not have any factual basis for projecting the production of that hypothetical 
well, do you?  

 


A. 
That is correct.  

 


Q. 
Okay.  It=s 
purely unsupported assumption, or estimation, isn=t 
it?  

 


A. 
No.  

As 
Kerr-McGee admits, assuming there were 60 feet of thickness of Lower Puryear below the hypothetical well, one Amight 
guess@ 
that the well would have produced some gas.  And, it is possible that the 
hypothetical well would have produced as much as Riley projected.  But our task is not to determine whether 
Riley=s 
opinion regarding the hypothetical well=s 
productivity is correct.  Rather, we 
must determine whether the analysis Riley used to reach his conclusions was 
reliable.  Based on this record, 
there is simply Atoo 
great an analytical gap between the data and the opinion@ 
to conclude that it is.  As in Gammill v. Jack Williams Chevrolet, Inc., 972 
S.W.2d 713, 727 (Tex. 1998), the gap in Riley=s 
analysis was his Afailure 
to show how his observations, assuming they were valid, supported his 
conclusions.@
Although 
Dr. Kerr estimated that the hypothetical well had fewer feet of Lower Puryear reservoir beneath it than Holmes 17-1 and Fleetwood 
Trust 16-1, Riley opined that the hypothetical well would have produced at the 
same rate as those wells and would have ultimately produced approximately 6.1 
Bcf of gas.  
Riley admitted that, all other factors being equal, a well with more 
thickness will have greater production than a well with less thickness.  When questioned as to why the 
hypothetical well, with fewer feet of Lower Puryear, 
would perform as well as the two wells with more thickness, Riley testified that 
skin damage, which had been a problem for the Holmes 17-1 well, could have been 
prevented with techniques learned in drilling Holmes 17-1.  He also testified that the hypothetical 
well would have been drilled in an Aup-dip@ 
location, about twenty-five feet structurally higher than Holmes 17-1, and 
therefore would water out later than Holmes 17-1.  While both may be true, Riley failed to 
testify with any specificity how these factors affected his calculations.  In addition, although Riley testified 
that he had Asome 
indications@ 
about the permeability or porosity of the hypothetical well, he did not testify 
what those indications were, whether he attempted to estimate the permeability 
or porosity of the hypothetical well, or whether those factors affected his 
production estimates, if at all.
Thus, 
although Riley examined facts and data that would be appropriate in reaching an 
opinion as to damages, there is no explanation of how these factors affected his 
calculations, if at all.  As the United States Supreme Court has said: ANothing 
in either Daubert or the Federal Rules of 
Evidence requires a . . . court to admit opinion evidence which is connected to 
existing data only by the ipse dixit of the 
expert.  A court may conclude 
that there is simply too great an analytical gap between the data and the 
opinion proffered.@  Gen. Elec. Co. v. 
Joiner, 522 U.S. 136, 146 (1997) (cited with approval by Gammill, 972 S.W.2d at 727).
Helton 
argues that other cases hold that plaintiffs in drainage cases can rely on data 
from existing wells to establish production of a hypothetical offset well.  See, e.g., GEO Viking, Inc. v. 
Tex-Lee Operating Co., 817 S.W.2d 357, 363 (Tex. App.BTexarkana 
1991), writ denied, 839 S.W.2d 797 (Tex. 1992) (per curiam); Vega Petroleum Corp. v. Hovey, 604 S.W.2d 388, 390 (Tex. Civ. App.BEastland 
1980, no writ); Wis-Tex Land Co. v. 
Simmons, 566 S.W.2d 719, 722-23 (Tex. Civ. 
App.BEastland 
1978, writ ref=d 
n.r.e.).  
Kerr-McGee does not dispute that data from existing wells may be 
considered in predicting a hypothetical well=s 
production.  But without knowing how 
Riley used that and other data to reach his conclusions in this case, we cannot 
determine whether Riley=s 
analysis was reliable.  Moreover, 
Riley failed to sufficiently explain why known differences in the wells, such as 
the thickness of the Lower Puryear reservoir 
encountered, would not result in different production rates.
In 
sum, even if the data Riley used is the type generally relied on by petroleum 
engineers to estimate production, and even if the underlying facts and data 
Riley used are accurate, there is simply too great an analytical gap between the 
data and Riley=s 
conclusions for the conclusions to be reliable and therefore some evidence.  Because Riley=s 
testimony regarding the amount of damages is incompetent, there is no evidence 
to support the amount of damages awarded by the trial court.  Accordingly, we reverse the court of 
appeals= 
judgment.
IV
Finally, 
we consider Helton=s 
request that, in the interest of justice, the case be remanded to the trial 
court.[6]  Texas Rule of Appellate Procedure 60.3 
provides: "When reversing the court of appeals' judgment, the Supreme Court may, 
in the interest of justice, remand the case to the trial court even if a 
rendition of judgment is otherwise appropriate."  Tex. R. App. P. 60.3.
AAs 
a general matter, when we sustain a no evidence point of error after a trial on 
the merits, we render judgment on that point.@  Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 86 (Tex. 1992) (citing Mobil 
Oil Corp. v. Frederick, 621 S.W.2d 595, 596 (Tex. 1981); Nat=l 
Life & Accident Ins. Co. v. Blagg, 438 S.W.2d 
905, 909 (Tex. 1969); Garza v. Alviar, 395 
S.W.2d 821, 823 (Tex. 1965)).
AThe 
most compelling case for [a remand in the interest of justice] is where we 
overrule existing precedents on which the losing party relied at trial.@ 
Westgate, Ltd. v. State, 843 S.W.2d  448, 455 (Tex. 1992).  Accordingly, we have remanded in the 
interest of justice when precedent has been overruled or the applicable law has 
otherwise changed between the time of trial and the disposition of the 
appeal.  See, 
e.g., Twyman v. Twyman, 
855 S.W.2d 619, 626 (Tex. 1993) (remand in interest of justice because case was 
tried on legal theory overruled by Court); Caller‑Times Publ=g 
Co., Inc. v. Triad Communications, Inc., 826 S.W.2d 576, 588 (Tex. 1992) 
(remand in interest of justice because Court announced new liability 
standard).
In 
support of the requested remand, Helton cites Amarillo Oil Co. v. 
Energy-Agri Products, Inc., 794 S.W.2d 20 (Tex. 
1990), a case in which we remanded in the interest of justice after concluding 
that the injunction sought by the plaintiff was not an available remedy.  We did so because Aour 
reported cases did not resolve the conflicting lines of cases as to whether 
injunctive relief should be allowed@ 
and our decision in Amarillo Oil Aclarified 
the law.@  Id. at 
28.  In contrast, our 
decision in this case does not foreclose or restrict either the remedy sought by 
Helton (money damages) or the measure of damages chosen by Helton (royalties 
that the hypothetical offset well would have yielded).  Moreover, our decision does not modify 
the evidentiary standard for recovery of damages in a suit against a lessee for 
breach of the implied covenant to protect the leasehold from drainage.  We concluded that Riley=s 
testimony was unreliable by applying our established jurisprudence regarding 
expert testimony.  Because our 
decision does not modify any legal precept, a remand in the interest of justice 
cannot be justified on that basis.
Helton 
also summarily asserts that a remand in the interest of justice is appropriate 
because Helton relied on the trial court=s 
admission of Riley=s 
testimony and exhibits.[7]  However, Kerr-McGee=s 
timely motion to strike Riley=s 
testimony during Helton=s 
case-in-chief, Kerr-McGee=s 
motion for judgment as a matter of law filed at the close of Helton=s 
case-in-chief, and Kerr-McGee=s 
motion for judgment filed after the close of all the evidence but before 
judgment was announced placed Helton on notice that Kerr-McGee was preserving 
error for an appeal challenging the legal sufficiency of Riley=s 
testimony and exhibits.  
Furthermore, Helton had an opportunity to bolster Riley=s 
testimony and exhibits on redirect and upon recalling him.  Helton=s 
conclusory assertion of reliance is clearly 
insufficient to justify a remand in the interest of justice.
The 
United States Supreme Court recently observed: AIt 
is implausible to suggest, post‑Daubert, that 
parties will initially present less than their best expert evidence in the 
expectation of a second chance should their first try fail.@  Weisgram v. Marley Co., 528 U.S. 440, 455 
(2000) (holding that authority of federal courts of appeals to direct entry of 
judgment extends to cases in which, on excision of expert testimony erroneously 
admitted, there remains insufficient evidence to support the verdict).  We agree with that observation.  The exacting standards for expert 
testimony set forth by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 
509 U.S. 579 (1993), General Electric Co. v. Joiner, 522 U.S. 136 (1997), 
and Kumho Tire Co. v. Carmichael, 526 
U.S. 137 (1999), and by this Court in E.I. du Pont 
de Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549 (Tex. 1995), 
Merrell Dow Pharmaceuticals, Inc. v. Havner, 
953 S.W.2d 706 (Tex. 1997), and Gammill v. 
Jack Williams Chevrolet, Inc., 972 S.W.2d 713 (Tex. 1998) are well-known to 
Texas litigators.
Helton 
had more than two years to prepare for the trial and does not contest 
Kerr-McGee=s 
assertion that, before trial, Kerr-McGee Aproduced 
all of their records for wells in the West Park Field, including geological 
records, well records, well logs, Railroad Commission reports, pressure and 
production records, etc.@  In addition, Helton had four trial days 
following Riley=s 
direct testimony in which to put on additional damages evidence in response to 
Kerr-McGee=s 
objections, but did not do so.
Both 
liability and damages were vigorously contested by the parties in the trial 
court.  A remand allowing Helton to 
redo or supplement Riley=s 
damages testimony would, without sufficient justification, provide Helton Aan 
opportunity for another >bite 
at the apple.=@ 
Jackson v. Ewton, 411 S.W.2d 
715, 719 (Tex. 1967).  
Moreover, a remand would force Kerr-McGee, who presented four expert 
witnesses at the week-long trial, to bear the time and 
expense of additional proceedings when it was Helton that failed to bring forth 
competent evidence to support an essential element of the pleaded cause of 
action despite ample opportunity to do so.
We 
decline, under the circumstances of this case, to exercise our discretion to 
remand in the interest of justice.  
Accordingly, pursuant to Texas Rule of Appellate Procedure 60.2(c), we 
render judgment that Helton take nothing.
 


__________________________________________
Steven 
Wayne Smith
Justice

 
 
Opinion 
delivered: January 30, 
2004
 
Map
 




[1] On September 17, 1996, Kerr-McGee Corporation assigned 
its interest in the sixty-one leases to Kerr-McGee North American Onshore 
Corporation.  On December 31, 1996, 
Kerr-McGee North American Onshore Corporation merged with Devon Energy 
Corporation (Nevada).  The successor 
entity was Devon Energy Production Company, L.P.  These entities, the petitioners, will be 
referred to collectively as AKerr-McGee.@

[2] A map of the West Park Field is 
attached.

[3]  16 Tex. Admin. Code 
' 3.37 (A[N]o well shall be drilled nearer than 467 feet to any 
property line, lease line, or subdivision line . . . .@).

[4] A tenth well, the Eden 1-01, 
was drilled in section 1 by another operator.

[5]  The trial 
court also awarded $190,068.75 in prejudgment interest from January 8, 1999 
through April 12, 2001, and $378,900.00 in attorney=s fees, for a total of $1,432,618.11 in 
damages.

[6] Helton states: AIn the event this Court grants review, finds that 
Kerr-McGee did not waive its objection to the reliability of Riley=s damages testimony, and finds that the evidence does 
not support the trial court=s damages determination, Plaintiffs request the court to 
remand for a damages determination in the interest of justice under T.R.A.P. 
60.3.@

[7] Helton states: APlaintiffs relied on the fact that Riley=s damages testimony and damages exhibits were admitted 
without objection.  Ellis, 
971 S.W.2d at 409 (the Court should not render judgment when the plaintiff 
relies on evidence being admitted).@