**AMOCO PRODUCTION COMPANY, Petitioners,**

v.

**John ALEXANDER et al., Respondents.**

**No. B–9131.**

Supreme Court of Texas.

Sept. 28, 1981.

Rehearing Denied Nov. 12, 1981.

McGinnis, Lochridge & Kilgore, Robert C. McGinnis and John W. Stayton, Jr., Austin, Dean J. Capp and James D. Klutz, Houston, for petitioners.

Scott & Douglass, Frank Douglass and Tom Reavley, Jr., Austin, Leland B. Kee, Angleton, for respondents.

CAMPBELL, Justice.

This is an action by royalty owners for damages because of field-wide drainage. The trial court, after a jury verdict, rendered judgment for the Alexanders, lessors, for actual and exemplary damages against Amoco, lessee. The Court of Civil Appeals reformed the trial court's judgment and affirmed the judgment as reformed. 594 S.W.2d 467. We modify the judgment of the Court of Civil Appeals and affirm the judgment as modified.

The Hastings, West Field, in Brazoria County, is a water-drive field. Water and oil are in the same reservoir. Because water is heavier than oil, the water moves to the bottom of the reservoir driving the oil upward. As oil is removed, water moves up to fill the space.

As the oil is produced, the oil-water contact (a measure of the reservoir water level) gradually rises until the wells begin to pro-

duce water along with oil. As the wells are produced, the fluid from the wells contains increasingly higher percentages of water. When the wells produce almost all water, the wells are abandoned. The wells are then said to be "watered out" or "flooded out."

The Hastings, West Field, reservoir is not horizontal. It is highest (closer to the surface) in the southeast part. It is lowest in the northwest. Hence, the reservoir dips downward gradually from the southeast to the northwest. Leases on the higher part of the reservoir are called "updip leases" and on the lower, "downdip leases." The Alexanders' leases with Amoco are downdip. Amoco, with 80% of the field production, also has updip leases. Exxon, Amoco's chief competitor in the field, owns leases generally updip from the Alexanders and downdip from the remainder of the Amoco leases.

In water-drive fields, such as the Hastings, West Field, natural underground conditions and production of oil updip work to the disadvantage of downdip leases. As the oil is produced, the oil-water contact rises. The greater the production from updip leases, the sooner the wells on downdip leases will be "watered out" because of the water-drive pushing the oil to the highest part of the reservoir. The downdip leases, therefore, are the first to water out. Moreover, production anywhere in the field will cause the oil-water contact to rise and move from the downdip leases to the updip leases. This is field-wide drainage.

The Alexanders' theory of this lawsuit is that Amoco slowed its production on the Alexander-Amoco downdip leases and increased production on Amoco updip leases causing the Alexander-Amoco downdip leases to "water out" much sooner. Oil not produced from the Alexander leases will eventually be recovered by Amoco as the water pushes the oil to the Amoco updip leases. Their theory of liability is that Amoco owed the Alexanders an obligation to obtain additional oil production from the Alexander leases by drilling additional wells and reworking existing wells to increase production. If Amoco had fulfilled that obligation, additional oil would have been produced from which the Alexanders would have been paid 1/6th royalty. The Amoco updip leases pay 1/8th royalty.

The Alexanders contend they pleaded two legal theories of recovery: (1) in contract, breach of Amoco by its implied obligation to take such steps as a reasonably prudent operator would have taken to protect the Alexander leases from drainage; and (2) in tort; for "intentional acts and omissions" undertaken by Amoco "for the purpose of increasing Amoco's production from its updip leases" and the deliberate waste of the Alexanders' royalty oil. The jury found:

(1) Amoco failed to operate the Alexander leases as a reasonably prudent operator.

(2) Amoco operated its leases under an intentional policy of maximizing its profits by producing less oil from the Alexander leases than would have been produced by a reasonably prudent operator, while increasing the drainage of oil from the Alexander leases by Amoco production on other leases.

The jury awarded actual and exemplary damages.

We must determine whether:

(1) Amoco had a duty to protect from field-wide drainage, or a duty not to drain the Alexander downdip leases by its operations updip.

(2) Amoco had a legal duty under the Alexander leases to apply to the Railroad Commission for permits to drill additional wells at irregular locations, to obtain the permits, and drill the wells.

(3) The trial court erred in admitting testimony that the Railroad Commission would have granted exception permits to allow Amoco to drill additional wells on the Alexander leases.

(4) The Alexanders are entitled to recover exemplary damages.

## FIELD–WIDE DRAINAGE

Whether Amoco had a duty to protect the Alexander downdip leases from field-wide drainage, or a duty not to drain the leases by its updip operations has not been considered by the Texas courts. The Court of Civil Appeals held Amoco had a duty to protect the Alexanders from field-wide drainage.

■ An oil and gas lessee has an implied obligation to protect from local drainage. Local drainage is oil migration from under one lease to the well bore of a producing well on an adjacent lease. Local drainage depends upon production from wells in a specific area in a field. It will begin, increase, or decrease according to production. Local drainage may be in several directions in one field and can be prevented by drilling offset wells. Field-wide drainage in a water-drive field, however, is relatively independent of the location of particular wells. It depends on the water-drive and production from all wells in the field. Protecting from field-wide drainage, therefore, is more difficult than protecting from local drainage.

Amoco urges the Court of Civil Appeals correctly held the drainage in this case was field-wide but the court erred in holding the law imposes an obligation upon Amoco to prevent field-wide drainage, or an obligation not to drain the Alexander leases by its updip operations. Amoco recognizes the obligation to protect from local drainage, but states the Court of Civil Appeals was in error in extending that obligation to require a lessee to protect his lessor from field-wide drainage. Amoco argues this imposes a new implied obligation never previously held to exist.

Has the Court of Civil Appeals imposed a new obligation never previously held to exist? The terms "obligation," "duty," and "covenant" have been used interchangeably in oil and gas cases to describe the performance required of a lessee under an oil and gas lease. Traditionally, matters relating to the development of the lease and the protection of the lessor's interest are not expressly included in the written lease. Since the early history of oil and gas litigation, the courts have held that covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and to protect the lease. In recent years, implied covenants have been expanded to matters of management of the lease. The words "duty" or "obligation" are best used to express the requirements of a lessee in performance of the implied covenants.

■ Commentators differ on the classification of implied covenants in oil and gas leases. *See* R. Hemingway, The Law of Oil and Gas § 8.1 (1971); 5 E. Kuntz, a Treatise on the Law of Oil and Gas § 55.1 (1978); 5 H. Williams & C. Meyers, Oil and Gas Law § 804 (1980); Walker, *The Nature of the Property Interests Created by An Oil and Gas Lease in Texas,* 11 Texas L.Rev. 399 (1933). These covenants are usually grouped into categories according to the factual basis of the dispute between the lessor and lessee. 5 H. Williams & C. Meyers, Oil and Gas Law § 804 (1980). However, these categories are specific applications of three broad implied covenants to particular controversies. These broad implied covenants are: (1) to develop the premises, (2) to protect the leasehold, and (3) to manage and administer the lease.[1]

■ The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and

1. Professor Hemingway has summarized the major implied covenants as follows:
 (A) Implied covenants to develop the leases.
 (1) To drill in initial well.
 (2) To reasonably develop the lease after production has been acquired.
 (B) Implied covenants of protection.
 (1) To protect against drainage.
 (2) Not to depreciate the lessor's interest.
 (C) Implied covenants relating to management and administration of the lease.
 (1) To produce and market.
 (2) To operate with reasonable care.
 (3) To use successful modern methods of production and development.
 (4) To seek favorable administration action. R. Hemingway, The Law of Oil and Gas § 8.1. (1971).

circumstances. *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex.1966); *Texas Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 431–32, 6 S.W.2d 1031, 1035–36 (1928). The reasonably prudent operator concept is an essential part of every implied covenant. Every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease.

Amoco contends the Court of Civil Appeals' holding expands the offset drilling obligation beyond the point of fairness and workability by including within it the obligation to offset field-wide or regional drainage. Field-wide drainage affects all leases in the field; and if the duty exists, each lessee may be required to drill offset wells. The drilling of offset wells increases field-wide drainage and sets off a chain reaction the drilling of each additional well would trigger a field-wide obligation to drill more offsets and each drilling would further accelerate the field-wide drainage. Amoco argues, therefore the end result of carrying out the obligation would be self-defeating.

Amoco also says that updip leases enjoy a natural advantage over downdip leases. If the natural drainage is to be offset, the only valid way is through field-wide regulation by the Railroad Commission regulating rates of production to protect correlative rights in the field.

 The implied covenant to protect against drainage is part of the broad implied covenant to protect the leasehold. The covenant to protect the leasehold extends to what a reasonably prudent operator would do under similar facts and circumstances. "As is true of the other implied duties, it is not easy to separate the duty from the standard of performance. The lessee is required generally to do what a prudent operator would do. Protection of the leased premises against drainage is but a specific application of that general duty." 5 E. Kuntz, a Treatise on the Law of Oil and Gas § 61.3 (1978). The covenant to

protect from drainage is not limited to local drainage. It extends to field-wide drainage. Oil lost by field-wide drainage is just as lost as local drainage oil. The methods of safeguarding from the loss may be different and protecting from local drainage may be easier. However, it is no defense for a lessee to say there is no duty to act as a reasonably prudent operator to protect from field-wide drainage.

 A lessor is entitled to recover damages from a lessee for field-wide drainage upon proof (1) of substantial drainage of the lessor's land, and (2) that a reasonably prudent operator would have acted to prevent substantial drainage from the lessor's land. In *Shell Oil Co. v. Stansbury, supra*, this Court held a reasonably prudent operator would have drilled a well on the lessor's land to protect from drainage. However, because of the complexity of the oil and gas industry and changes in technology, the courts cannot list each obligation of a reasonably prudent operator which may arise. The lessee must perform any act which a reasonably prudent operator would perform to protect from substantial drainage.

 The duties of a reasonably prudent operator to protect from field-wide drainage may include (1) drilling replacement wells, (2) re-working existing wells, (3) drilling additional wells, (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief. There is no duty unless such an amount of oil can be recovered to equal the cost of administrative expenses, drilling or re-working and equipping a protection well, producing and marketing the oil, and yield to the lessee a reasonable expectation of profit. *Clifton v. Koontz*, 160 Tex. 82, 96–97, 325 S.W.2d 684, 695–96 (1959).

The Court of Civil Appeals has not imposed a new obligation upon Amoco. The jury, in finding that Amoco failed to operate the Alexander leases as a reasonably prudent operator, has determined that Amoco failed in its duties under the implied covenants to protect the leasehold.

Amoco argues the Court of Civil Appeals did not consider that Amoco has obligations to all of its lessors in the field. Anything it does to maintain or increase production from updip leases may accelerate the water drive and expose Amoco to liability to downdip lessors. If Amoco fails to maintain or increase updip production, it is exposed to liability from the updip lessors. Amoco argues the Court has placed it between contrary obligations from which there is no escape. The fulfilling of one obligation necessarily causes the breach of the other.

The conflicts of interest of Amoco, as a common lessee, cause us concern. The Alexander leases provided for ⅛th royalty while Amoco's updip leases provided for ⅛ th royalty. There is no economic incentive for Amoco to increase production on the Alexander lease because it will eventually recover the Alexander's oil updip. Money invested in the Hastings, West Field, will have a longer productive life if invested updip. The greater the updip production the sooner Amoco's competitor Exxon will water out. Money spent updip will yield greater returns than money spent downdip because of higher daily production. With downdip operators out of production Amoco can produce its upper sands without competition and can begin production from its lower sands where it does not have significant production competition.

These conflicts would not occur if Amoco was not a common lessee (lessee common to downdip and updip lessors). If the Alexanders were the only Amoco lessor, their interests would more nearly coincide. Amoco's interest would be to capture the most oil possible from the Alexander leases before they watered out.

 Amoco's responsibilities to other lessors in the same field do not control in this suit. This lawsuit is between the Alexanders and Amoco on the lease agreement between them and the implied covenants attaching to that lease agreement. The reasonably prudent operator standard is not to be reduced to the Alexanders because Amoco has other lessors in the same field.

Amoco's status as a common lessee does not affect its liability to the Alexanders.

## DUTY TO APPLY FOR ADMINISTRATIVE RELIEF

The Railroad Commission rules in the Hastings, West Field, prohibit the drilling of a well nearer than 660 feet to any other well and nearer than 330 feet to any property line or lease line. The rules allow the Railroad Commission to grant drilling permits as an exception to the spacing regulation. These exceptions are commonly referred to as Rule 37 permits. This rule provides:

[T]he Commission in order to prevent waste or to prevent the confiscation of property will grant exceptions to permit drilling within shorter distance than above prescribed whenever the Commission shall determine that such exceptions are necessary to prevent waste or to prevent confiscation of property.

The Alexanders contend Amoco should have drilled replacement wells in the extreme updip corner of each lease. The wells would be within 50 feet of the lease line and 200 feet apart. The wells could not be drilled unless the Railroad Commission granted Rule 37 permits. Amoco did not apply for the permits.

The Court of Civil Appeals held that when Amoco determined the leases were watering out, prudent operation demanded drilling replacement wells unless it would be economically unfeasible. If Rule 37 permits were required, Amoco should have applied for them in furtherance of its duty to prudently operate the leases. Because Amoco failed to apply, the Court of Civil Appeals held, the Alexanders were entitled to show the exceptions most likely would have been granted and they suffered damages because of Amoco's failure.

Amoco states the holding of the Court of Civil Appeals amounts to the imposition of an implied covenant obligating a lessee to seek exceptions to regulations limiting the drilling and production of wells. Amoco argues there is no Texas authority for im-

posing an obligation to seek administrative relief and there is no duty to seek administrative relief.

■ We disagree with Amoco's argument that there is no duty to seek administrative relief. Amoco owed the Alexanders the duty to do whatever a reasonably prudent operator would do if the Alexanders were its only lessor in the field.

The duty to seek favorable administrative action may be classified under the implied covenants to protect the lease, or to manage and administer the lease. Regardless of the category, the standard of care in testing Amoco's performance is that of a reasonably prudent operator under similar facts and circumstances. *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex.1966); 5 H. Williams & C. Meyers, Oil and Gas Law § 804 (1980).

■ We do not agree with the Court of Civil Appeals if its holding means that in every case of field-wide drainage the lessee must seek Rule 37 exceptions. There may be facts where the prudent operator would not seek administrative relief. The probability that the Railroad Commission will grant or deny the permit is a consideration to be made by the prudent operator. The jury, from evidence justifying granting or denying the permit, can determine if a reasonably prudent operator would have applied for the permit.

The jury found Amoco failed to operate the Alexander leases as a reasonably prudent operator. Does this finding, based in whole or in part on Amoco's failure to apply for Rule 37 permits, establish liability for failure to drill the replacement wells? If it does not, what remedies do the Alexanders have? They have no rights in the management or operation of the oil leases. Amoco, as operator, could quickly determine when the wells began watering out. Amoco, because of its conflicting interests, had no economic incentive to protect the Alexander leases. The downdip lessors, after their leases have watered out, have no opportunity to capture the oil updip.

It is the failure to act as a reasonably prudent operator that triggers the loss. If the Railroad Commission denies the Rule 37 permits, after a reasonably prudent application, the operator has no liability for not drilling the wells. We hold that an operator, who fails to act as a reasonably prudent operator by not seeking Rule 37 permits, is liable for loss caused by the failure to drill the wells.

## TESTIMONY THAT THE RAILROAD COMMISSION WOULD GRANT RULE 37 PERMITS

The Alexanders' two expert witnesses testified, in response to hypothetical questions, that the Railroad Commission would have granted approval to drill the replacement wells. Amoco contends the admission of this evidence is reversible error.

The jury question was whether Amoco operated the leases as a reasonably prudent operator. In answering this question the jury had to determine whether a reasonably prudent operator would have requested Rule 37 permits. The jury was not asked whether the Railroad Commission would have granted them.

There was other evidence on which the jury could base its decision. Amoco knew that: this was a water-drive field and the Alexander leases were downdip; these leases would water out first; the leases began watering out; a 25% increase in field production, allowed by the Railroad Commission, would speed up the watering out of the leases; there was a process by which permits could be granted; drainage was occurring as early as 1972; Amoco's action updip was accelerating the drainage; Amoco could recover the Alexander oil on its updip leases; Amoco had no economic incentive to drill replacement wells on the Alexander leases; the Alexander leases would be the first to require additional replacement wells.

There was evidence that the Railroad Commission granted twenty-two Rule 37 permits to Exxon and Amoco updip in the same fault block section of this field beginning in 1975. The jury could also consider

that Amoco, in opposing a 1973 Rule 37 application on the adjacent Pearland lease, represented that the Pearland lease had 2.9 million barrels of oil originally in place. This meant that in 1973 the lease had already produced all of its recoverable oil originally in place. However, in the course of this litigation, Amoco revealed that the calculation of its own reservoir engineers showed that 3.884 million barrels of oil were originally in place under the Pearland lease.

■ This Court has upheld the admissibility of evidence showing the reasonable probability that zoning restrictions will be lifted. *See City of Austin v. Cannizzo*, 153 Tex. 324, 333–35, 267 S.W.2d 808, 814–15 (1954). However, we need not decide whether it was error to admit the answers to the hypothetical questions in this case because the answers are cumulative to other evidence presented to the jury. This Court is not of the opinion that such error, if any, amounted to such a denial of Amoco's rights as is reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.Civ.P. 434, 503.

### EXEMPLARY DAMAGES

Amoco argues that exemplary damages are not recoverable because the Alexanders failed to plead and prove a tort allowing recovery of exemplary damages. We agree.

The Alexanders alleged "a breach by Amoco of both its express and implied covenants ... under the lease contracts ... to protect said leases from drainage and to operate said leases as a reasonable and prudent operator" and their "royalty interest under Leases A and B has been wasted and damaged ...."

First, Amoco argues that exemplary damages are not recoverable because a breach of the implied covenant to protect against drainage is an action sounding in contract and not in tort. The rights and duties of the lessor and lessee are determined by the lease and are contractual. The lease constitutes the contract. In the absence of express provisions to the contrary, the lease imposes upon the lessee several implied covenants, including the duty to protect against drainage. *Texas Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 431, 6 S.W.2d 1031, 1035 (1928); *see* Note, 12 St. Mary's L.J. 600, 601–602 (1980).

■ In *Texas Pac. Coal & Oil Co. v. Stuard*, 7 S.W.2d 878, 882 (Tex.Civ.App.—Eastland 1928, writ ref'd), the Court of Civil Appeals held that "the implication to develop after drilling the exploratory well is a part of the written contract and is governed by the four-year statute of limitation." In *Indian Territory Illuminating Oil Co. v. Rosamond*, 190 Okl. 46, 120 P.2d 349, 354 (1941), the Oklahoma Supreme Court held that "the implied covenant to protect against drainage is a part of the written lease as fully as if it had been expressly contained therein..." and applied the statute of limitations relating to actions on written contracts. We hold that the implied covenant to protect against drainage is a part of the lease and is contractual in nature.

■ Exemplary damages are not allowed for breach of contract. *A. L. Carter Lumber Co. v. Saide*, 140 Tex. 523, 526, 168 S.W.2d 629, 631 (1943); *McDonough v. Zamora*, 338 S.W.2d 507, 513 (Tex.Civ.App.—San Antonio 1960, writ ref'd n. r. e.). Even if the breach is malicious, intentional or capricious, exemplary damages may not be recovered unless a distinct tort is alleged and proved. *City Prods. Corp. v. Berman*, 610 S.W.2d 446, 450 (Tex.1980); *A. L. Carter Lumber Co. v. Saide, supra. K. W. S. Mfg. Co. v. McMahon*, 565 S.W.2d 368, 372 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.). We hold that a breach of the implied covenant to protect against drainage is an action sounding in contract and will not support recovery of exemplary damages absent proof of an independent tort.

Second, Amoco argues that exemplary damages are not recoverable under a cause of action for "waste." The Alexanders as lessors under the oil and gas leases are not entitled to maintain an action for waste. Waste is defined as "permanent harm to real property, committed by tenants for life

or for years, not justified as a reasonable exercise of ownership and enjoyment by the possessory tenant and resulting in a reduction in value of the interest of the reversioner or remainderman." *Moore v. Vines,* 474 S.W.2d 437, 439 (Tex.1971); 1 American Law of Property § 2.16e (1952).

■ The common law theory of waste must not be confused with an action for negligent waste or destruction of minerals which may be maintained by a mineral or royalty owner. *See Elliff v. Texon Drilling Co.,* 146 Tex. 575, 583, 210 S.W.2d 558, 563 (1948). The Alexanders owned a ⅛th royalty interest in the leases. A royalty or royalty interest, whether created by grant or reservation or by lease, is an interest in real property and is a fee simple interest in land. *Sheffield v. Hogg,* 124 Tex. 290, 298, 77 S.W.2d 1021, 1024 (1934).

This is not a waste case. There has been no "waste" as defined in section 85.046(a) of the Texas Natural Resource Code. There has been no negligent waste or destruction as occurred in *Elliff, supra.* Nor has there been an ultimate loss by a reversionary or remainder interest. The problem is the operation, by a common lessee, of some leases to the detriment of others.

TRIAL OF COMMON LESSEE CASES

The courts that have considered the common lessee problem have considered facts different from this case. In those cases the common lessee was causing the drainage by production on adjacent or adjoining land. The drainage was caused by production independent of water-drive and was local drainage. However, those decisions are analogous because of the common lessee. Professors Williams and Meyers have put these cases in three categories. *See* 5 H. Williams & C. Meyers, Oil and Gas Law § 824 (1980); Meyers & Williams, *Implied Covenants in Oil and Gas Leases: Drainage Caused by the Lessee,* 40 Texas L. Rev. 923 (1962). First, there are cases which state the lessee was causing the drainage but place no significance on that fact. *See, e. g., Billeaud Planters v. Union Oil Co. of Cal.,* 245 F.2d 14, 18–19 (5th Cir. 1957);

*Gerson v. Anderson-Prichard Prod. Corp.,* 149 F.2d 444, 445–46 (10th Cir. 1945); *Chapman v. Sohio Petroleum Co.,* 297 S.W.2d 885, 886–87 (Tex.Civ.App.—El Paso 1956, writ ref'd n. r. e.). Second, other cases state that the lessee caused the drainage but hold this fact does not alter the ordinary rules of liability for failure to protect from drainage. *Hutchins v. Humble Oil & Ref. Co.,* 161 S.W.2d 571, 573 (Tex.Civ.App. —Galveston 1942, writ ref'd w. o. m.); *accord, Tide Water Associated Oil Co. v. Stott,* 159 F.2d 174, 177 (5th Cir. 1946). Third, there are cases holding the liability of the lessee is increased when the lessee is causing the drainage. *See, e. g., Cook v. El Paso Natural Gas Co.,* 560 F.2d 978, 982–84 (10th Cir. 1977) (reasonable prudent operator rule inapplicable in common lessee case, proof of drainage all that is required); *Bush Oil Co. v. Beverly-Lincoln Land Co.,* 69 Cal.App.2d 246, 158 P.2d 754, 758 (1945) (immaterial whether protection well would be profitable if drainage caused by lessee's affirmative act); *Phillips Petroleum Co. v. Millette,* 221 Miss. 1, 72 So.2d 176, 183 (Miss. 1954) (lessee strictly liable for substantial drainage caused by own affirmative acts).

This Court in *Shell Oil Co. v. Stansbury,* 410 S.W.2d 187, 188 (Tex.1966), expressly overruled the *Hutchins* case, *supra,* and held that an express offset provision does not limit the lessee's obligation to protect from drainage when the lessee is the one causing the drainage. In drainage cases, Texas courts place upon the lessor the burden to prove that substantial drainage has occurred and that an offset well would produce oil or gas in paying quantities. *Clifton v. Koontz, supra.*

The judgment of the Court of Civil Appeals is modified to prohibit the recovery of exemplary damages and affirmed as modified.