NO. 07-08-00376-CV

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL D

 



OCTOBER
5, 2010

 



 

THE PETROLEUM SYNERGY GROUP, INC., APPELLANT

 

v.

 

OCCIDENTAL PERMIAN, LTD., APPELLEE 



 



 

 FROM THE 154TH DISTRICT COURT OF LAMB
COUNTY;

 

NO. 16386; HONORABLE FELIX KLEIN, JUDGE



 



 

Before QUINN,
C.J., and CAMPBELL and PIRTLE, JJ.

 

 

OPINION

 

This is an oil drainage case.  The Petroleum Synergy Group, Inc. (PSG) owns
an overriding royalty interest in a lease in Lamb County operated by Occidental
Permian, Ltd. (OPL).  PSG filed suit
against OPL alleging OPL breached the implied covenant to prevent substantial
drainage of the leasehold.  The jury did
not find the occurrence of substantial drainage and the trial court rendered a
take-nothing judgment in favor of OPL. 
On appeal, PSG argues it proved substantial drainage as a matter of law
and the trial court reversibly erred by two evidentiary rulings.  For the reasons that follow, we will affirm.

Background

            The
geology of the Anton-Irish (Wolfcamp) Field features
two anticlines, referred to as the eastern and western.[1]  The parties’ dispute involves the production
of oil from the western anticline.  There
OPL operates the one-quarter section Snitker
lease.  PSG owns an approximate 5.5
percent overriding royalty interest in lease production.  OPL also owns two leases immediately north of
the Snitker, the Roach and Stephenson leases, each
containing roughly eighty acres.  PSG
owns no interest in the Roach or Stephenson leases.  

            The
Texas Railroad Commission adopted temporary field rules for the Anton-Irish (Wolfcamp) Field in September 2001.  The field rules called for eighty-acre
proration units, a minimum distance of 467 feet separating a well from the
nearest lease line, and a maximum daily oil allowable
of 400 barrels for a well on an eighty-acre proration unit.

Another company, Devon Energy
Corporation, operates its Lancaster lease, lying immediately east of OPL’s Snitker lease.  Devon
completed its Lancaster No. 1 well, located 467 feet east of the line dividing
the Lancaster and Snitker leases, in December
2001.  In January 2002, OPL began
drilling its first well on the Snitker lease, the Snitker No. 1.  The
well site was 467 feet west of the east Snitker lease
line.  Snitker
No. 1 was completed in February 2002 as an oil well producing at the maximum
allowable rate, 400 barrels of oil per day. 


In April 2002, Devon completed its
Lancaster No. 2 well, north of the Lancaster No. 1 but also located 467 feet
from the Snitker lease line.  OPL promptly offset Devon’s well by drilling
its Snitker No. 2, located due north of the Snitker No. 1.  When
completed in May 2002, Snitker No. 2 also produced
400 barrels of oil per day.  

On the Roach lease, OPL completed the
Roach No. 1 as an oil well during July 2002. 
The surface location of the well is 132 feet north of the Snitker lease line with a bottom hole
location 45 feet from the Snitker lease line.  On the Stephenson lease, OPL completed the
Stephenson No. 1 as an oil well during November 2002.  The surface location of the well is 136 feet
north of the Snitker lease line with a bottom hole 37
feet from the Snitker lease line.  

To drill the Roach No. 1 and
Stephenson No. 1 wells closer than 467 feet from the Snitker
lease line, OPL applied for and obtained exceptions under the Railroad
Commission’s Rule 37.[2]  Because OPL also was the operator of the Snitker lease, it was the only party entitled to notice of
OPL’s requested exceptions, under the terms of Rule 37.  

An internal OPL document, dated in
2005, lists each of the company’s wells producing from the western anticline,
together with certain information for each well.  Among the information is the company’s
estimate of the percentage of the oil originally in place each well eventually
would produce.  According to the
estimates, the two Snitker wells would produce no
more than 56 percent of the oil originally in place but the Roach No. 1 would
produce as much as 195 percent, and the Stephenson No.
1 as much as 285 percent, of the oil originally in place.

            PSG
brought suit, alleging OPL breached the implied covenant to protect the Snitker lease against drainage by the Roach and Stephenson
wells.  The jury disagreed, finding no
substantial drainage of the Snitker.  The trial court rendered judgment that PSG
take nothing and denied the motion of PSG for judgment notwithstanding the
verdict.  This appeal followed.

Analysis

Issues

Through three issues PSG argues: (1)
it proved substantial drainage of the Snitker lease as
a matter of law; (2) the trial court reversibly erred by instructing the jury
to disregard PSG’s testimony in rebuttal to a defensive theory of OPL; (3) the
trial court reversibly erred by allowing an OPL expert to render a previously
undisclosed opinion.

            Whether PSG made conclusive proof of
substantial drainage 

PSG first asserts it established
substantial drainage as a matter of law. 
A claim for breach of the covenant to protect against drainage of the
lease requires the plaintiff to prove substantial drainage and that a
reasonable and prudent operator would have acted to prevent the substantial
drainage. Amoco
Production Co. v. Alexander, 622 S.W.2d 563, 568 (Tex. 1981); Grayson v. Crescendo Res., L.P., 104
S.W.3d 736, 740 (Tex.App.--Amarillo 2003).  Here, in its first question to the jury, the
court inquired:

“Do you find from a preponderance of the evidence that substantial
drainage of oil or gas has occurred from the Snitker
lease in the Anton-Irish (Wolfcamp) Field?”

 

The court defined “substantial
drainage” as “the drainage of a sufficient quantity of oil that would cause a
reasonably prudent operator, with the expectation of making a reasonable
profit, to take action to protect it from that drainage.”  The jury responded “no” to the question.  Because the remaining questions submitted
were conditioned on an affirmative response to question one, the jury made no
further answers.

A party attacking the legal
sufficiency of an adverse jury finding on an issue on which the party bore the
burden of proof must demonstrate all vital facts in support of the issue were
established as a matter of law.  Dow Chemical Co. v. Francis,
46 S.W.3d 237, 241 (Tex. 2001) (per curiam).  The analysis requires we first examine the
record in the light most favorable to the verdict for some evidence supporting
the jury’s finding, crediting evidence favoring the finding if a reasonable
fact finder could and disregarding contrary evidence unless a reasonable fact
finder could not.  City of Keller v. Wilson, 168 S.W.3d
802, 807, 822 (Tex. 2005).  Some evidence, meaning more than a
scintilla, exists when the
evidence “rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.”  Merrell Dow Pharms., Inc. v Havner, 953 S.W.2d 706, 711 (Tex. 1997).  If, however, no evidence appears to support
the finding, we then examine the entire record to determine whether the
contrary proposition is established as a matter of law.  Francis, 46 S.W.3d at 241; Raw
Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 276 (Tex.App.--Amarillo 1988, writ denied).  A proposition is established as a matter of
law when a reasonable fact finder could draw only one conclusion from the
evidence presented.  City of Keller, 168 S.W.3d at 814-16; Brent v. Field, 275 S.W.3d 611, 619 (Tex.App.--Amarillo 2008, no pet.).

The Anton-Irish (Wolfcamp)
Field was described in testimony as a water-drive field.[3]  Terry Dean Payne, a reservoir engineer,
testified for OPL. He categorized the field as a “very strong water drive
field.”  According to Payne, impermeable
shale overlies the oil-bearing rock in the anticline.  Above the granite “basement” rock, a large
aquifer underlies the eastern and western anticlines.   Between the aquifer and the oil-bearing rock
lies a transition zone of oil and water.

Payne told the jury that the weight
of the mile-and-a-half of rock resting on top of the reservoir pressurized the
reservoir fluids to 2,600 pounds per square inch.  The volume of oil in the reservoir is small
compared to the aquifer, such that production of oil does not cause a
significant change in reservoir pressure. 
Thus, Payne explained, production of four million barrels of oil from
the western anticline had caused a pressure decline of only about sixty pounds
per square inch.  He said that as oil is
produced from the wells, “the aquifer advances up and pushes that oil to the
top of the structure so the oil is essentially replaced with water from
underneath.”[4] 

Payne distinguished the pattern of
hydrocarbon drainage typically seen in a “depletion drive” reservoir from that
in a reservoir with a water drive present. 
With the former, especially when the hydrocarbon-bearing rock has good
permeability, fluids typically flow toward the wellbore in a radial pattern
around the well.  Payne said such a
radial drainage pattern does not characterize a water drive reservoir.  Instead, he said, the advance of fluids is
“from below.” 

Testimony described leases overlying
the higher part of the anticline geological structure as “updip”
leases and those over the lower part as “downdip.”  Payne stated that in a water-drive field, as
oil is produced, wells located in a downdip location
at a point begin to produce an oil-water mixture while those updip on the reservoir continue producing oil.  As time passes, wells higher on the structure
are the last to remain in production. 
When the volume of water produced by a well becomes so large and the
volume of oil so comparatively small that continued production is infeasible,
the well is said to “water out.”

Wayman Gore, a petroleum engineering expert
testifying for PSG, agreed that the Roach and Stephenson leases are downdip of the Snitker, and that
the Snitker is the “most updip”
lease OPL operates on the western anticline. 
Payne specified that the Roach No. 1 and Stephenson No.1 wells are
eighty or more feet downdip of the Snitker wells.    

Mike Smith, an engineer and OPL’s
team leader for development of the field, also testified.  He also described the field as a “bottom
water drive reservoir.”  As oil is
produced, “you have an endless supply of water underneath that’s continuing to
provide reservoir energy and support and that oil just migrates [its] way up
through that anticline.”  He
characterized an oil flow from an updip location to
one downdip as “swim[ming] against th[e] flow.”  According to Smith, because of the
reservoir’s “bottom water drive” and its resulting upward flow of fluids
through the reservoir, “you should not get a significant amount of supply from updip from across the Snitker lease
line.”  He later told the jury he saw no
evidence of substantial drainage of the Snitker
lease.  Payne also opined that the Snitker lease had not been substantially drained.   

Production data provided by Smith
showed an increasing percentage of water production from the Roach lease as
compared with the Snitker wells.  By September 2005 daily production from the
Roach No. 1 was 93 barrels of oil and 656 barrels of water.  At the same time, the Snitker
No. 1 yielded daily production of 258 barrels of oil and 13 barrels of water
and the Snitker No. 2 produced 160 barrels of oil and
53 barrels of water.  Smith agreed data
of this character is expected in a bottom water drive reservoir as the water
level rises.

Pointing to such evidence as the
close proximity of the Roach and Stephenson wells to the Snitker
lease line, the premise underlying the field rules that a well will drain
eighty acres, the favorable permeability of the oil-bearing rock in the area of
the Snitker lease, and the internal OPL estimates
that the Roach well would produce almost twice the oil originally in place, and
the Stephenson almost three times, PSG contends the evidence nonetheless
conclusively establishes the occurrence of local drainage of the Snitker lease by the two adjoining wells.  Viewing the evidence in the light most
favorable to the verdict, and indulging every reasonable inference in support
of the verdict, City of Keller, 168
S.W.3d at 822, however, we find more than a scintilla of evidence supports the
jury’s negative response to question one. 
Accordingly, we do not reach an analysis of the evidence PSG considers
conclusive.  PSG’s first issue is
overruled.

PSG’s two remaining issues concern
rulings of the trial court excluding and admitting evidence.  We review a trial court’s decision excluding
or admitting evidence under an abuse of discretion standard.  In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005).  Even if evidence is improperly excluded or
admitted, we will reverse only if the error probably caused the rendition of an
improper judgment.  Tex. R. App. P.
44.1(a)(1); see
Bay Area Healthcare Group, Ltd. v. McShane, 239
S.W.3d 231, 234 (Tex. 2007) (citing Tex. R. App. P. 61.1(a)).  To determine if the error of the trial court
was harmful, we review the entire record and require the complaining party to
demonstrate the judgment turns on the particular evidence admitted or
excluded.  Nissan Motor Co. v. Armstrong, 145
S.W.3d 131, 144 (Tex. 2004); City of
Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex. 1995).

 

 

            Instruction to disregard rebuttal testimony

            By
its second issue, PSG argues the trial court erred by instructing the jury to
disregard certain testimony of its expert Wayman Gore
in rebuttal of a defensive theory raised by OPL.

According to Gore’s rebuttal
testimony and demonstrative exhibits, underlying a portion of the field,
including the Snitker lease, is dolomite rock known
for its desirable porosity.  Other areas
in the field contain less permeable limestone. 
Data Gore attributed to OPL indicated a seventy-one percent oil recovery
factor in the dolomite area of the field while, in his opinion, the limestone
area of the field yielded a forty percent recovery factor.  The recovery factor of the Snitker lease was fifty-six percent.  Gore opined the difference between the
recovery factor for the Snitker lease and that of
other dolomite leases in the field indicated substantial drainage of the Snitker lease.

            OPL
objected on the grounds the testimony was not disclosed during discovery and
Gore’s conclusions were not reliable. 
During a hearing outside the presence of the jury, the court sustained
the objection.  When the jury returned,
the court gave the following verbal instruction:

“Ladies and gentlemen, there’s been some testimony related to a
71-percent recovery factor.  You will
disregard any testimony related to a 71-percent recovery factor and any opinion
derived therefrom.”

Announcing its ruling on OPL’s
objection, the trial court noted that Gore’s recovery factor comparison relied
in part on the recovery factor of leases on the eastern anticline.  The court further pointed out Gore had
testified he had not inspected or studied the eastern anticline. The court had
heard evidence that net recovery calculations are affected by rock porosity and
other factors such as the fracturing present in the rock.  Without reliable data showing that the
characteristics of the rock underlying the two anticlines could fairly be
compared, the trial court could have considered Gore’s recovery factor comparison
flawed.  See Cooper Tire & Rubber
Co. v. Mendez, 204 S.W.3d 797, 800-801 (Tex. 2006) (analyzing reliability
of expert testimony).  We agree with OPL
that, based on the information before it, the trial court thus could have found
Gore’s conclusions regarding the seventy-one-percent recovery factor to be
unreliable.  We are unable to say the
trial court abused its discretion by excluding the evidence of a seventy-one
percent recovery factor covered by its instruction.   

Even were we to assume it was error
to exclude rebuttal testimony related to a seventy-one percent recovery factor,
our review of the entire record shows the error harmless.  Even if admitted, Gore’s rebuttal testimony
would not reduce the probative force of evidence we have already found legally
sufficient to support the jury’s answer to question one of the charge.  The excluded evidence of which PSG here
complains did not cause the rendition of an improper judgment.  Tex. R. App. P. 44.1(a)(1).  We overrule the PSG second issue.

            Undisclosed expert opinion

            By
its third issue, PSG urges the trial court erred by allowing OPL expert Brian
Sullivan to testify on a previously undisclosed opinion.

            PSG
posits OPL did not timely disclose expected expert testimony of Sullivan to the
effect a permit for drilling an offset well requires an operator prove to the
Railroad Commission the operator is not receiving its “fair share” of
production.  This testimony, PSG urges,
left “the jury with the impression that the Snitker
had not been substantially drained.”

            The
issue arises in the following colloquy.

Q. [counsel for OPL]            In a
Rule 38 hearing, does one have to demonstrate that the wells they currently
have producing on the tract would not recover their fair share of the oil?

A. [Sullivan]              Yes,
sir, (sic) that is correct.  That’s what the test
is, and that’s what the commission publishes in its books.

            In
an amended scheduling order the trial court required OPL to designate rebuttal
experts by February 1, 2008. The court added, “[s]uch
designation shall include disclosures that comply with the requirements of TRCP
194.2(f).”  By a writing served that
date, OPL designated Sullivan as a rebuttal witness.  PSG deposed Sullivan on April 22, within
thirty days of trial.  

PSG does not complain of the
substance or sufficiency of Sullivan’s deposition responses.  Rather, it contends at deposition Sullivan
provided opinions which were not previously disclosed.  Because expert opinions were obtained by
deposition, generally a pro forma
supplementation of a disclosure response with the same information is
unnecessary. Tex. R. Civ. P. 193.5(a)(2). But here the
deposition disclosure of Sullivan’s opinions came within thirty days of
trial.  As we follow PSG’s complaint, OPL
was obligated to, but did not, obtain a finding of good cause for untimely
disclosure or that the untimely disclosure did not cause unfair surprise or
unfair prejudice to PSG.  Tex. R. Civ. P.
193.6(a),(b). 
OPL urged in the trial court that until Gore testified at trial, it was
unable to more specifically disclose Sullivan’s expected rebuttal testimony.

            Even
were we to assume the trial court erred by allowing the objected-to portion of
Sullivan’s testimony, the record does not demonstrate such testimony probably
caused the rendition of an improper judgment.  Tex. R. App. P. 44.1(a)(1).  PSG asserts the jury was left with the
“impression” that the Snitker lease had not been
substantially drained.  But during its
case-in-chief OPL presented the evidence we have outlined supporting the jury’s
negative finding to question one’s inquiry of substantial drainage.  Since this proof was legally sufficient apart
from the opinion of Sullivan, the judgment did not turn on its erroneous
admission.  Moreover, because evidence of
no substantial drainage was admitted without objection, the complained-of
testimony was merely cumulative and its admission harmless.  See In
the Interest of W.J.H., 111 S.W.3d 707, 714 (Tex.App.--Fort
Worth 2003) (erroneous admission of evidence merely cumulative of that properly
admitted elsewhere is ordinarily harmless). 
PSG’s third issue is overruled.

Conclusion

Having overruled each of the issues
of PSG, we affirm the judgment of the trial court.

                                                                                                James
T. Campbell

                                                                                                            Justice

 

            








 











[1]  An anticline
is “[a] subsurface, geological structure in the form of a sine curve; that is,
the formation rises to a rounded peak.” 8 Howard R. Williams
& Charles J. Meyers, Oil and Gas Law, Manual of Terms 49 (Patrick H. Martin
& Bruce M. Kramer eds., 1998). “[A]n arch of
stratified rock in which the layers bend downward in opposite directions from
the crest.”  Merriam-Webster’s
Collegiate Dictionary 54 (11th ed.).  See Texaco, Inc. v. R.R. Comm’n, 583
S.W.2d 307 (Tex. 1979); Pickens v.
Railroad Commission of Tex., 387 S.W.2d 35 (Tex. 1965) (both describing
oil-producing formations underlying anticlines).





[2]  16 Tex. Admin. Code § 3.37(a)(1)
(Lexis 2009) (Tex. R.R. Comm’n, Statewide Spacing
Rule).





[3] The dynamics of oil production in a water-drive field
are described in Alexander, 622
S.W.2d at 565-66.  See also Pickens, 387 S.W.2d at 40-42 (containing descriptions of
effect of water drive on oil production). 

 





[4] For demonstrative purposes, the trial court allowed
the jury to view a video animation of a water drive pushing oil in an oil field
upward to a well bore.  By accompanying
question and answer, Payne narrated.  The
animation does not portray drainage from updip to downdip areas of the reservoir; rather, it shows water
pushing oil upward to well bores.  It
depicts wells lower on the structure watering out first.  Before presentation of the animation the
trial court instructed the jury, “It’s being offered only for the purposes of
helping you understand a water drive system. It’s not being offered for and you
will not consider it for any facts that actually apply to this case.  [I]t’s just offered
to help you kind of understand the concept behind the water drive system . . .
.”