COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| THALEIA L. MARSTON, TRUSTEE OF THE MARSTON TRUST and LAWRENCE M. MARSTON, | § | No. 08-23-00166-CV |
| | § | Appeal from the |
| Appellants/Cross-Appellees, | § | 143rd Judicial District Court |
| v. | § | of Ward County, Texas |
| BLACKBEARD OPERATING, LLC; MAGIC DOG OIL & GAS LTD; NORTHSTAR OPERATING; BOAZ ENERGY II, LLC; ARGENT TRUST COMPANY, AS TRUSTEE FOR PERMROCK ROYALTY TRUST; and GOODNIGHT MIDSTREAM PERMIAN, LLC, | § | (TC# 18-10-24761-CVW) |
| | § | |
| | § | |
| | § | |
| | § | |
| Appellees/Cross-Appellants. | § | |

## MEMORANDUM OPINION

Appellants Thaleia L. Marston, as trustee of the Marston Trust, and Lawrence Marston (collectively, the Marstons) appeal summary judgments for Appellees Blackbeard Operating, LLC, Magic Dog Oil & Gas, Ltd, Northstar Operating, Boaz Energy III, LLC and Simmons Bank, as Trustee for Permrock Royalty Trust (collectively, Blackbeard) and Goodnight Midstream Permian, LLC. The Marstons, having leased their mineral interests to Blackbeard, complain that Blackbeard assigned their rights under the lease without their consent to Goodnight which

converted producing wells to saltwater disposal wells, terminating the royalty payments they were receiving. They argue that the trial court erred in entering summary judgments because a fact issue exists for each of their causes of action. Because the record shows that the Marstons have either abandoned their claims, or failed to direct the trial court, or this Court, to specific evidence of damages for those they have not abandoned, we affirm the judgments below.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Marston Trust owns a 29.1666% interest in the mineral estate in parts of four sections in Ward County. The Trust, together with Lawrence Marston, also owns the surface rights in three of the sections. That said, neither own the surface rights for Section 1 which, as explained below, is the only section that is the subject of this appeal.

On April 10, 2012, the Trust leased its rights to Mecca Exploration, LLC, for "the purpose of investigating, exploring, prospecting, drilling and producing oil and gas." Those leases were eventually assigned to Blackbeard.[1] The Marstons and Blackbeard also entered into a surface use agreement and a saltwater disposal agreement.

The leases had a primary term of three years that expired on April 10, 2015. They contain continuous operations clauses that extend the leases for certain periods of time if the lessee is engaged in drilling or reworking wells or producing oil and gas in paying quantities. The lease remains in effect after the primary term so long as the lessee begins drilling a new well every 180 days. Once the lease terminates for failure to continue drilling new wells, the following is retained by the lessee:

> acreage around a producing well in paying quantities in the form of a square or rectangle tract containing the minimum number of acres permitted by the Railroad

---

[1] Blackbeard also had leases from the owners of the other 70.833% of the mineral interest estate. Those owners are not parties to this appeal.

Commission of the State of Texas for a full proration unit, absent field rules establishing proration units, an oil well retains a 40 acre unit, a gas well retains 160 acre unit plus horizontal producing extension acres, and thereafter ipso facto terminate as to any permanent proration unit upon cessation of production in paying quantities thereunder.

The lease further provides that it "may NOT be assigned in whole, or in part, without written consent of Lessor" but that "permission shall not be unreasonably withheld by Lessor."

On November 8, 2018, Blackbeard notified the Marston Trust that it intended to assign its interest in the lease for Section 1 to Goodnight and requested consent. On November 14, 2018, and without receiving the required consent, Blackbeard assigned to Goodnight the leases it had with all five mineral interest owners of Section 1, Block B-29, including the lease with the Marstons. The assignment recites that Blackbeard and Goodnight understand that Goodnight intended to convert four of the wells in Section 1 to saltwater disposal wells. On November 19, 2018, the Marstons responded that they did not consent to the assignment because of "outstanding issues between the Trust and Blackbeard regarding the deep rights covered by the leases, the retained acreage clauses, and the surface damages owed to the Trust by Blackbeard." The Marstons did not object to the assignment on the ground they do now–that Goodnight is a company that operates saltwater disposal wells.

After the assignment, Goodnight converted four of the wells on Section 1 to saltwater disposal wells.[2] They contracted with Blackbeard to continue operating the two remaining wells. Because operations ceased, the lease terminated pursuant to its own terms and Goodnight released all interest in the lease except for 40-acre proration units around the two producing wells.

---

[2] Goodnight states that it took measures to protect the hydrocarbons in the Clearfork formation by sealing off the disposal area.

On October 1, 2018, the Marstons filed suit. Over the next almost three and a half years, the Marstons were represented by three sets of attorneys and their suit was amended three times. Blackbeard and Goodnight each filed no-evidence and traditional motions for summary judgment. Blackbeard also filed a second motion for summary judgment. The Marstons responded and filed their own motion for summary judgment which they later abandoned.

The trial court granted Blackbeard's and Goodnight's first summary judgment motions on all of Marston's causes of action. The trial court's final judgment incorporated its prior summary judgment orders, awarded attorney's fees to Blackbeard and Goodnight, and denied "all other relief requested but not expressly granted herein."

The Marstons appeal raising four issues. In issues one and two, they argue that the trial court erred in granting Goodnight's no-evidence and traditional motions for summary judgment. In issues three and four, they argue that the trial court erred in granting Blackbeard's traditional and no-evidence motions for summary judgment. Blackbeard filed a cross-appeal, arguing that the trial court implicitly and improperly denied its second motion for summary judgment.

## II.     CLAIMS ON APPEAL

### A.  The Marston's causes of action

By the time of the trial court's final judgment, the Marston's suit asserted ten causes of action: declaratory judgment, trespass to try title, conversion, trespass, breach of contract, breach of fiduciary duty, breach of implied covenant, negligence, and tortious interference with contract. In its reply brief, the Marstons expressly abandoned its causes of action for trespass to try title, conversion, trespass, and breach of fiduciary duty. The causes of action before us are further reduced because the Marstons have made no argument on appeal that the trial court wrongly

4

granted summary judgment on their declaratory judgment or accounting claims.[3] Consequently, the claims before us are (1) breach of contract, (2) breach of implied covenant, (3) negligence, and (4) tortious interference with contract.

## B. Arguments on Appeal

### (1) Claims against Goodnight

For each claim against Goodnight, the Marstons' brief consists of long block quotes from their summary judgment response with no additional argument. Those arguments are as follows:

### (a) Breach of contract

The Marstons argue that Goodnight breached the contract in three ways. First, they claim that the undisputed fact that Goodnight converted the wells to saltwater disposal wells is a breach of the lease because it contravened the lease's stated purpose of "investigating, exploring, prospecting, drilling and producing oil and gas." Goodnight counters that a lease's stated purpose is not a promise or a covenant capable of being breached. *See All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 561 (Tex. App.—El Paso 2009, no pet.) (explaining that a contract's recitals of "the reasons upon which the transaction is founded" is "generally not part of a contract"). Goodnight further argues that the lessee is not required to continue producing after the primary term; the lease simply terminates by its own terms if they do not do so.

Second, the Marstons also argue that Goodnight breached the lease by using the leasehold equipment after the lease terminated. Goodnight responds that the lease does not prohibit the *use*

---

[3] Even though the Marstons raised a *Malooly* issue, which places the entire grant of the summary judgements at issue, they are still required to provide arguments for each of the claims for which they seek reversal. *See Ramirez v. First Liberty Ins. Corp.*, 458 S.W.3d 568, 572 (Tex. App.—El Paso 2014, no pet.) (finding waiver of two of the four claims disposed of by summary judgment order when no distinct argument on the claims were made in Appellant's brief).

of leasehold equipment. Rather, the lease states that if the lessee does not remove the leasehold equipment within 60 days of the lease's termination, it belongs to the lessor.

Third, the Marstons allege that Goodnight breached the lease by retaining and using 40 acres, rather than ten acres, surrounding one of the producing wells.[4] Goodnight argues that during discovery, the Marstons conceded that Goodnight was entitled to retain a full 40 acres per well.

### (b) Breach of implied covenant

Courts imply covenants "when they are fundamental to the purposes of a mineral lease and when the lease does not expressly address the subject matter of the covenant sought to be implied." *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 889 (Tex. 1998). "Texas law has long recognized that an oil and gas lease imposes duties on the lessee that extend beyond the terms of the lease itself if the lease is silent on certain subjects. These implied covenants may include duties to develop the premises, protect the leasehold, and manage and administer the lease." *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 373 (Tex. 2001). The three "broad implied covenants are (1) to develop the premises, (2) to protect the leasehold, and (3) to manage and administer the lease." *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981).

The Marstons argue that by converting producing wells into saltwater disposal wells, Goodnight breached the implied covenant to act as a reasonably prudent operator to develop the premises. Goodnight responds that the decision whether to continue production requires specialized knowledge, and that the Marstons needed to, but failed, to offer expert testimony to establish whether a reasonably prudent operator would continue to operate the wells. They also argued that a reasonably prudent operator is only expected to continue operating a well when it is

---

[4] There are two producing wells remaining on Section 1. On appeal, the Marstons only complain about the acreage retained for one of the wells.

profitable for them after the cost of production and marketing, and the Marstons offered no evidence that it would be. Additionally, they argued that a covenant to continue production cannot be implied because it is the subject of express terms in the lease: the lease itself provides that it terminates if production ceases.

### (c) Negligence

The Marstons argued that Goodnight's "negligent failure to perform the requirements set forth in the contract constitutes negligence." Goodnight contends that because the parties' relationship and duties are created by contract, the claim sounds in contract, and the Marstons cannot recover on a negligence claim. *SW. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("if the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract").

### (d) Tortious interference with a contract

Finally, the Marstons contend that Goodnight tortiously interfered with its contract with Blackbeard because Goodnight knew that the lease could not be assigned without the Marstons' consent and they still "proceeded with the closing of the purchase of the Section 1 assets. . . ." Goodnight counters that Goodnight's knowledge of the contract is not enough. To show tortious interference, the Marstons must also show that Goodnight knew that the Marstons withheld consent and they *induced* Blackbeard to violate the lease's terms.

In their reply brief, the Marstons summarize their position but do not respond to Goodnight's specific arguments.

### (1) Claims against Blackbeard

Other than for the tortious interference with contract, the Marstons asserted the same causes of action against Blackbeard. In their petition, the Marstons alleged that Blackbeard breached their

lease several ways, some that do not pertain to Section 1 or the assignment of the lease to Goodnight. For example, they alleged that Blackbeard was liable for drilling wells after the termination of the lease, failing to pay surface damages, and breaching the surface use and salt water disposal agreements. On appeal though, the Marstons do not discuss those claims. The sum of their argument against Blackbeard on all claims is the following:

> Blackbeard's arguments that [the Marstons'] claims fail as a matter of law should have been rejected by the trial court because taking the summary judgment as true with every reasonable inference indulged in favor of the Marstons, the defendants worked together to convert the oil and gas wells into saltwater disposal wells without the Marstons' consent, contrary to the terms of the leases, thereby destroying the wells' ability to continue producing oil and gas.

The Marstons have failed to raise an appellate issue about any claims against Blackbeard that do not relate to the assignment of the Section 1 lease to Goodnight. Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Larned v. Gateway E., Inc.*, 186 S.W.3d 597, 600 (Tex. App.—El Paso 2006, no pet.) (stating that an appellant's duty on appeal is not met "by merely uttering brief conclusory statements, unsupported by legal citations").

Focusing on the claims properly before us, we now turn to the trial court's summary judgment rulings.

## III.   ANALYSIS

### A.  Standard of review

Blackbeard and Goodnight each filed both traditional and no-evidence motions for summary judgment. The trial court granted summary judgment for both on all causes of action. Because the orders do not state the grounds for summary judgment, we must affirm if the judgment

is correct under any theory. *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003)

A party is entitled to a traditional summary judgment if it establishes that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. . . ." Tex. R. Civ. P. 166a(c). A party can also move for summary judgment "on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). The nonmovant then has the burden of producing at least a scintilla of evidence of the challenged claims. *N&A Properties, Inc. v. PH Steel, Inc.*, 656 S.W.3d 556, 571 (Tex. App.—El Paso 2022, no pet.). To meet this burden, the evidence must do more "than create a mere surmise or suspicion of a fact." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019).

We review an order granting summary judgment *de novo. Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We consider the evidence "in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

When a party seeks review of a summary judgment on both traditional and no-evidence grounds, we review the no-evidence grounds first. *Id.* "[I]f the non-movant fails to produce legally sufficient evidence to meet his burden as to the no-evidence motion, there is no need to analyze whether the movant satisfied its burden under the traditional motion." *Id.*

## B. Evidence of damages

Damages is an element of each of Martsons' claims. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018) (breach of contract elements); *Amoco*, 622 S.W.3d at 567–568

(applying breach of contract elements when the covenant is implied); *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied) (same); *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) (negligence elements); *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995) (tortious interference with contract elements). Goodnight and Blackbeard both moved for summary judgment on the ground that the Marstons had no evidence of damages for their breach of contract, breach of implied covenant, negligence, or tortious interference claims. In their brief, the Marstons only quote conclusory statements from their summary judgment response regarding damages for each cause of action. For example, when discussing the breach of contract claim against Goodnight, the Marstons cite only generally to their 38-page summary judgment response and quote the following:

> Plaintiff has also provided significant evidence establishing damages resulting from Goodnight's breaches of contract. Most clearly, it is undisputed that the conversion of the four Lawrence wells to SWDs resulted in Plaintiff going from receiving monthly oil and gas royalty revenues to receiving absolutely nothing from the four converted SWDs. Plaintiff has also provided evidence establishing damages for the 21/72nds interest the Marston Trust obtained in all of the leasehold equipment that Goodnight continues to use to the detriment of Plaintiff. Goodnight's actions in using more acreage than is allowed for the Lawrence #4 proration unit is also damaging to Plaintiff.

But despite asserting that they provided evidence of damages, neither their brief nor the summary judgment response from which they quote point us to specific evidence of damages.

Similarly, regarding damages from the alleged breach of implied covenant, the Marstons state, "The evidence is clear that the conversion of the oil wells into SWDs has damaged Plaintiff financially, as Plaintiff went from receiving revenue checks from the oil wells to receiving absolutely nothing from the converted SWDs." And, for the negligence claim, the Marstons quote their response: "It is undisputed that the conversion of the four Lawrence wells to SWDs

10

proximately caused damages to Plaintiff, as Plaintiff went from receiving monthly oil and gas royalty revenues to receiving absolutely nothing from the four converted SWDs." But, again, no evidence was produced with the summary judgment response or cited to in the brief.

Only the Marstons' summary judgment response for their tortious interference claim cites to specific evidence. The response states, "There is evidence establishing that the four oil wells that Goodnight converted to SWDs were commercially productive of oil and gas in paying quantities . . . ." As evidence, it cites to deposition testimony of Kareem Ahmed, a Blackbeard representative, that before the wells were converted, they were producing between one and three barrels a day. But the fact that the wells were producing is not evidence that the Marstons were damaged by Blackbeard's assignment of the lease. There was no evidence about how long the wells would have continued to produce that amount. To the contrary, Mr. Ahmed testified that production "typically decline[s] fairly quickly." More importantly, there was no evidence that production of one to three barrels a day was profitable to Blackbeard or Goodnight such that they would have had to continue operations (which they obviously chose not to). *See Clifton v. Koontz*, 325 S.W.2d 684, 695 (1959) (an operator "is not required to continue in the performance of these duties or to engage in the performance of such implied duties unless there is a reasonable expectation of profit, not only to the lessor, but also to the lessee"); *Amoco*, 622 S.W.2d at 568 ("There is no duty unless such an amount of oil can be recovered to equal the cost of administrative expenses, drilling or re-working and equipping a protection well, producing and marketing the oil, and yield to the lessee a reasonable expectation of profit."). In other words, the Marstons failed to produce evidence that they would have continued to receive royalties even if Blackbeard had not assigned the lease to Goodnight, or if Goodnight had not converted the wells. Even viewing this

11

evidence in the light most favorable to the Marstons, it does no more than "create a mere surmise or suspicion of a fact." *KMS Retail Rowlett*, 593 S.W.3d at 181.

The Marstons needed to point to specific evidence supporting their claims. They did not do so at the trial court or on appeal. "In the absence of any guidance from the non-movant where the evidence can be found, the trial and appellate courts are not required to sift through voluminous [records] in search of evidence to support the non-movant's argument that a fact issue exists." *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied); *see also Walker v. Eubanks*, 667 S.W.3d 402, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (affirming no-evidence summary judgment when Plaintiff's response did not "direct the trial court to evidence he argued created a fact issue" or "contain any analysis of the evidence or an explanation of how his 173-page exhibit raised any issue of material fact"). In fact, if we were to undertake an independent review of the record in search of evidence to support the Marstons' claim, we would be "abandoning our role as neutral adjudicators and become an advocate for that party." *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.).

Because the Marstons failed to produce evidence of damages, an essential element to the four claims before us, the trial court properly entered summary judgment on those claims. Tex. R. Civ. P. 166a(i). We overrule the Marstons' issues one through four. Given our affirmance of the judgment on this basis, there is no need to review the grant of Appellees' traditional motions for summary judgment or the implicit denial of Blackbeard's second motion for summary judgment. Appellees' cross appeal is therefore overruled as moot.

## IV. CONCLUSION

The Marstons failed to meet their burden in responding to Blackbeard and Goodnight's no-evidence motion for summary judgment. The judgment below is affirmed.

JEFF ALLEY, Chief Justice

December 12, 2024

Before Alley, C.J., Palafox, and Soto, JJ.